ELIAS DIGGINS, CJM, CCE - 10/25/2016 - CONTAINS CONFIDENTIAL AND NONCONFIDENTIAL MATERIAL
Terri Eddy, et al.  v. City and County of Denver, et al.

---

Page 29

1 time is better spent managing the floor rather than
2 roster management.
3     Q.  Are there any policies or guidelines that
4 exist that guide or tell the roster sergeants or the
5 floor sergeants how they're supposed to do roster
6 assignments, or is it entirely up to their discretion?
7     A.  It's based upon what they believe to be
8 the best skills and abilities of the deputies that are
9 assigned to the floor at that time.
10     Q.  And circling back to what we were talking
11 about a few minutes ago, do I understand correctly
12 that if, in fact, the floor sergeants or the roster
13 sergeant consistently place a particular deputy in a
14 particular building or post, the scheduling unit is
15 going to wind up presumptively putting that deputy in
16 that post after a while going forward?
17     A.  That's correct.
18     Q.  It's sort of like the process works
19 both -- what actually happens on the floor kind of
20 feeds back to into what the scheduling unit does?
21     A.  That's correct.
22     Q.  And do you know if that's done
23 automatically?  In other words, the actual roster --
24 the final roster assignments are entered into some
25 kind of database, and the software automatically sees

Page 30

1 the pattern and starts assigning the deputy there?  Or
2 is it done manually:  Some employee in the scheduling
3 unit looks at rosters and enters something into the
4 computer?
5     A.  Previously it was done manually.  I
6 believe TeleStaff can do it automatically, but there
7 is still some manual input that can be done as well.
8     Q.  What's your understanding as to when the
9 process became at least partially automated?
10     A.  When we deployed TeleStaff.
11     Q.  Which was when?
12     A.  At the end of my term as the sheriff.
13     Q.  You're going to test my memory.  And that
14 was October of 2015?
15     A.  Around that time.
16     Q.  Okay.  Do you know whether it is possible
17 in TeleStaff to run a report that would show that
18 Deputy Jordan is primarily assigned to Building 24 and
19 the same kind of information for other deputies?
20     A.  I'm not a subject-matter expert in
21 TeleStaff.
22     Q.  The answer is you don't know?
23     A.  I do not know.
24     Q.  Okay.  Do you know to what extent the
25 department has available, whether in paper or in

Page 31

1 electronic records, actual -- well, let me make sure
2 we have our terminology straight first.
3     When the scheduling unit sends the
4 information to the floor sergeants -- here's the
5 assignments for the sheriff -- that's called a roster?
6     A.  Correct.
7     Q.  When the floor sergeants makes some
8 changes and reassigns some people, what's that final
9 product called?
10     A.  Could you repeat your question?
11     Q.  Sure.  So assume the roster comes from
12 the scheduling unit and the floor sergeant makes some
13 changes.  They move some people around.  So now you've
14 got the final roster, if you will.  What's that
15 called?
16     A.  There's no name for it.  It's just a
17 roster.
18     Q.  So essentially this sort of preliminary
19 roster that comes from the scheduling unit and the
20 final roster that says where people are actually
21 working?
22     A.  Yes.
23     Q.  And sometimes they may be the same;
24 sometimes they may be different?
25     A.  That's correct.

Page 32

1     Q.  When the floor sergeant or the roster
2 sergeant makes some changes, is there some piece of
3 paper that has the final assignments on it that's
4 going to show those changes?
5     A.  Yes.
6     Q.  Do they just sort of take the piece of
7 paper they print out from the scheduling unit and
8 write on changes, or do they generate a new document?
9     A.  They can do both.
10     Q.  And is there also -- do they also enter
11 in electronically the changes they make?
12     A.  They do now.
13     Q.  Since TeleStaff came along?
14     A.  Correct.
15     Q.  Prior to TeleStaff, did they enter in
16 those changes?
17     A.  No.
18     Q.  Okay.  So let's start by talking about
19 since TeleStaff was implemented.  Is it possible to go
20 back and say, Okay, January 3, 2016, second watch, and
21 pull up the roster that the scheduling unit sent to
22 the floor sergeants; do you know?
23     A.  I do not know.
24     Q.  Is it possible -- to the extent the floor
25 sergeants made changes, is it possible to go into

**Exhibit A**

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

Case 1:15-cv-02539-CMA-STV Document 69-1 Filed 11/16/16 USDC Colorado Page 2 of 6

ELIAS DIGGINS, CJM, CCE - 10/25/2016 - CONTAINS CONFIDENTIAL AND NONCONFIDENTIAL MATERIAL
Terri Eddy, et al. v. City and County of Denver, et al.

33

TeleStaff and say, Okay, what was the actual final roster for January 2, 2016, second watch?
  A. I do not know.
  Q. Who would know the answer to those questions?
  A. Sergeant Telesin.
  Q. Does he supervise the scheduling unit?
  A. He just moved from the scheduling unit about three weeks ago, but prior to that, he was there during the implementation.
  Q. Okay. And then prior to TeleStaff, if I understood you correctly, if the floor sergeant changed the roster they got from the scheduling unit, it would just be a paper record of that?
  A. Correct.
  Q. Did the department preserve those records, or do they just get thrown away at the end of each shift?
  A. They get preserved.
  Q. Do you know how far back they're preserved for?
  A. I do not know.
  Q. Who do you expect would know the answer to that question?
  A. Sergeant Telesin.

34

  Q. Can a deputy who is assigned to one of the two jail divisions request that they be regularly assigned to a particular building?
  A. They can ask the building sergeant.
  Q. And it's up to the building sergeant whether to grant that request or not?
  A. Correct.
  Q. Since there are two sergeant shifts, are there two building sergeants, or is there one sergeant for each building?
  A. Depends on the building.
  Q. Let's take Building 24-F, for example.
  A. Which building?
  Q. 24. 24.
  A. Building 24 has five sergeants which are assigned to it 24 hours, seven days a week.
  Q. So if a deputy for whatever reason wanted to work regularly in Building 24, which sergeant or sergeants would have the authority to grant that request?
  A. Any of the five.
  Q. Okay. And if they granted that request, they would just inform the scheduling unit so the scheduling unit knew to assign that deputy to Building 24?

35

  A. Correct.
  Q. Are there any written policies that would inform a sergeant's decision or guide a sergeant's decision whether or not to grant such a request?
  A. No.
  Q. How about transfers between divisions? Say a deputy that was in the county jail wanted to go to the DDC for any reason. Who's got authority to grant or deny that request?
  A. The division chiefs and sheriff.
  Q. Are there any written policies that guide or inform the decisions of the chiefs and sheriff on a request like that?
  A. Yes.
  Q. What policies are there that you're aware of?
  A. We have the transfer policy.
  Q. Has the department made any changes in the last couple years -- not just correcting a typo, but any substantive changes in the last couple years to its policies or practices governing either reassignments within a division or transfers between divisions?
  A. Yes.
  Q. What changes have been made in the last

36

couple years?
  A. The title of special assignments was modified to provisional assignments, and a cap was put on the length of time someone could be placed into a provisional assignment, and the length of time that someone had to stay on the floor between provisional assignments was added as well.
  Q. And is the reason for the change in name to reflect the change in policy that you described in terms of the time limits and requirements?
  A. No.
  Q. Okay. What was the reason for the change in time?
  A. Because I believe that at the time when I was the sheriff, special assignments were looked at in just that way, that those folks were special and that they were different from the floor deputies.
     In polling my peers through the large jail network, no one else titles those posts as "special assignments."
     So I looked for a synonym for what the title should be and chose "provisional."
  Q. What word were you looking for a synonym for?
  A. "Temporary."

Case 1:15-cv-02539-CMA-STV   Document 69-1   Filed 11/16/16   USDC Colorado   Page 3 of 6

**ELIAS DIGGINS, CJM, CCE - 10/25/2016 - CONFIDENTIAL**
Terri Eddy, et al. v. City and County of Denver, et al.

### 113

1  turn to page 23.  Changing now to one of the other
2  topics on the deposition notice, which has to do with
3  the means that are available for deputies to record
4  information or report information.
5       In the middle of this page, there's a
6  reference to a building logbook.  Do you see that?
7       A.  Yes.
8       Q.  What is the building logbook?
9       A.  It's a notebook that documents activities
10 in the building.
11      Q.  And so a deputy that's working a shift
12 and there's some information the deputy thinks it may
13 be relevant for someone on a later shift to know, they
14 can record that information in a logbook?
15      A.  Correct.
16      Q.  And you referred to it as a notebook.  As
17 of today, are the logbooks physical paper notebooks?
18      A.  I believe the county jail has gone to an
19 electronic logbook.
20      Q.  Do you know about when that occurred?
21      A.  I don't recall the exact date.
22      Q.  Was it sometime in the last couple years?
23      A.  Yes.
24      Q.  And how about the DDC?
25      A.  The DDC has been on electronic logbooks

### 114

1  for a number of years.
2       Q.  What is the software program or product
3  called that contains that logbook?
4       A.  TAG.
5       Q.  Do you know what TAG stands for?
6       A.  I do not.  It's a name for our jail
7  management system.  T-A-G.
8       Q.  And is TAG the name of a product or the
9  name of a company that makes the product, if you know?
10      A.  It's the name of the product.  I believe
11 the company was Syscon.
12      Q.  S-y-s-c-o-n?
13      A.  I believe so.
14      Q.  I'm not sure if this analogy will mean
15 something to you or not, but I'm going to try.  In the
16 commercial world, there's what's called enterprise
17 software, and Oracle, for example, is a big maker of
18 enterprise software, like JD Edwards.
19          Is the TAG system kind of like a
20 correctional facility version of enterprise software,
21 if you know what I'm talking about?
22      MS. ALLEN:  Objection.  Form.
23      A.  I do not.
24      Q.  (BY MR. MOORE)  Generally speaking, what
25 functions are performed or contained within the TAG

### 115

1  software?
2       A.  Any electronic record that a deputy would
3  like to keep, including logging rounds, making
4  reports, booking in inmates.  It's a very dynamic
5  system.
6       Q.  Is the rostering done through the TAG
7  system?
8       A.  It is not.
9       Q.  Does the TAG system contains the
10 department's means of tracking inmates through its
11 facilities?
12      A.  Yes.
13      Q.  And I think we were talking specifically
14 about the DDC.  As of today, does the county jail also
15 use the TAG system for its logbooks?
16      A.  Yes.
17      Q.  So that's both DDC and county jail?
18      A.  Correct.
19      Q.  Okay.  The paper logbooks that were kept
20 prior to the county jail going onto the TAG system,
21 did the department keep those paper books in storage
22 somewhere?
23      A.  Yes.
24      Q.  Do you happen to know for how long -- how
25 far back its kept those books?

### 116

1       A.  We keep them in accordance with the City
2  retention schedule.
3       Q.  Do you happen to know, for TAG books in
4  particular, how long that means?
5       A.  I do not.
6       MS. ALLEN:  I'm sorry.  You said "TAG
7  books."  Did you mean logbooks?
8       MR. MOORE:  I did mean logbooks.  Thank
9  you.
10      Q.  (BY MR. MOORE)  What sorts of information
11 generally are deputies expected to record in a
12 logbook, whether that be paper or the TAG system?
13      A.  Generally they're expected to record when
14 they have conducted rounds, when they receive inmates,
15 when they release inmates from their building, and any
16 other usual events that might occur.
17      (End confidential excerpt.  Proceedings
18 continued on page 117.)

Case 1:15-cv-02539-CMA-STV   Document 69-1   Filed 11/16/16   USDC Colorado   Page 4 of 6

**ELIAS DIGGINS, CJM, CCE - 10/25/2016 - CONTAINS CONFIDENTIAL AND NONCONFIDENTIAL MATERIAL**
Terri Eddy, et al.  v. City and County of Denver, et al.

117

1  (Proceedings continued from page 116,
2  line 18.)
3  (Deposition Exhibit 17 was marked.)
4  Q. When a deputy enters information into a
5  logbook, is that referred to as a log entry?
6  A. Yes.
7  Q. Is Exhibit 17 an example of a log entry
8  made using the TAG system?
9  A. Yes.
10  Q. If you take a look at what's written on
11  the entry here, is that an appropriate -- is that an
12  appropriate use of the logbook to record this
13  information?
14  A. Yes.
15  Q. We'll look in a minute at something I
16  think is called an offense-in-custody report, but if a
17  deputy enters an offense-in-custody report, an
18  incident number will be assigned to that report,
19  correct?
20  A. Correct.
21  Q. Do I understand correctly that incident
22  numbers are not assigned to log entries?
23  A. That is correct.
24  Q. And generally speaking, there's not any
25  expectation that any kind of CAB proceeding will be

118

1  following a log entry, is there?
2  MS. ALLEN: Objection. Form.
3  A. It depends on the nature of the log
4  entry.
5  Q. (BY MR. MOORE) Is there anyone who has,
6  as a part of their job, an expectation that they
7  review log entries?
8  A. Sergeants review any and all
9  documentation that deputies produce.
10  Q. Okay. So if a deputy entered in log
11  entry information that indicate an offense had
12  occurred by an inmate even though the deputy hadn't
13  submitted it as an offense-in-custody report, the
14  sergeant could still see that information and, him- or
15  herself, initiate the offense process, the CAB
16  process?
17  A. If there was something that they
18  reviewed, but there isn't any requirement that all
19  shift-log entries are reviewed.
20  Q. With respect to OIC reports, is there a
21  requirement that all OIC reports made by a deputy be
22  reviewed?
23  A. If they are related to an offense, yes.
24  Q. Are OIC reports supposed to be made for
25  anything that's not related to an offense?

119

1  A. They can be.
2  Q. What else is it proper to use OIC reports
3  for?
4  A. If there was something that occurred in
5  the facility that was of note, such as a door breaking
6  or something along those lines, then a deputy might
7  choose to make a record of that as an OIC.
8  Q. So that could be done as either a log
9  entry or an OIC, and either is fine?
10  A. Correct.
11  Q. But how would a sergeant know if there
12  was an offense contained in that report unless they
13  looked at the report?
14  A. The deputy would alert them that they
15  need to have a sergeant review and accept the report.
16  Q. When you say "accept the report," what
17  does that mean?
18  A. It means the sergeant reviews the report
19  for the detail of the report and makes sure that the
20  deputy did not leave anything out of the report,
21  because it's considered an official document in our
22  agency.
23  Q. And then once the sergeant has done that
24  and is satisfied it is a complete report, is there
25  like a button the sergeant clicks or something the

120

1  sergeant does to accept the report?
2  A. Yes. And the sergeant also completes a
3  report stating that they have reviewed the report.
4  Q. Okay. I just want to make sure I've got
5  this right. If a deputy chooses to use the OIC report
6  to report something that's not an offense -- the
7  broken-door example you gave -- then they don't
8  necessarily bring that to a sergeant and the sergeant
9  doesn't necessarily have to read that report?
10  A. Correct. They might contact maintenance
11  or someone else.
12  Q. But if the deputy enters what the deputy
13  considers to be an offense into an OIC report, then
14  the deputy is supposed to alert a sergeant that they
15  entered that report?
16  A. That is correct.
17  Q. And then the sergeant is expected, at
18  that point, to review the report?
19  A. That's correct.
20  Q. If the sergeant thinks the report is not
21  complete, can't yet be accepted for some reason, is
22  the sergeant supposed to let the deputy know what else
23  they need to do to complete the report?
24  A. Yes.
25  Q. And is the idea that every OIC report

Case 1:15-cv-02539-CMA-STV Document 69-1 Filed 11/16/16 USDC Colorado Page 5 of 6

ELIAS DIGGINS, CJM, CCE - 10/25/2016 - CONTAINS CONFIDENTIAL AND NONCONFIDENTIAL MATERIAL
Terri Eddy, et al. v. City and County of Denver, et al.

129

1 know, that for this incident, Number 60904, suppose
2 there had been two other staff members that witnessed
3 what happened and submitted their own reports
4 associated with that number, and assume a supervising
5 officer then did some CAB investigation and made a
6 report associated with that same incident number. Is
7 there a way within the TAG system to print a document
8 that's going to show all of those reports?
9     A.  A supervisor would have permission to do
10 so.
11    Q.  And is there a way to refer to that, to
12 refer to the printout or the screen that's going to
13 show you every report entered by anyone having to do
14 with a particular incident number?
15    A.  It's the OIC staff report.
16    Q.  So an OIC staff report on a particular
17 incident number is going to show you all the
18 information that's been entered in the TAG system
19 regarding that incident?
20    A.  That's correct.
21    Q.  Is that a report sergeants have authority
22 to view and run?
23    A.  Yes.
24    Q.  But deputies don't, I take it?
25    A.  Generally, no.

130

1    Q.  To what extent, if any, have you been
2 involved in the City's or the department's production
3 of documents in this case?
4    A.  I haven't been involved at all.
5    Q.  Do you know who the point person for the
6 department has been?
7    A.  Sergeant Joey Garcia is responsible for
8 civil liabilities and also for responses to SDTs.
9    Q.  Meaning not just in this case, but in
10 general, he's got the responsibility for the
11 department?
12    A.  Correct.
13    Q.  Is he the head of the civil liabilities
14 section?
15    A.  No. Major Blair is.
16    Q.  And Sergeant Garcia reports to Major
17 Blair?
18    A.  That's correct.
19    Q.  So assume a deputy on the floor is
20 verbally abused by an inmate. What are the different
21 means by which that deputy could properly report that
22 verbal abuse?
23    A.  They can do so verbally to a supervisor
24 or in writing to a supervisor.
25    Q.  And when you say "in writing," would

131

1 completing an OIC report be an appropriate way, in
2 writing, to communicate that?
3    A.  Yes.
4    Q.  And would a log entry be an appropriate
5 way to report that?
6    A.  Could you tell me the situation again,
7 Mr. Moore.
8    Q.  Where an inmate kind of verbally abuses a
9 deputy.
10    A.  If the deputy wants to write the inmate
11 up, they would have to do it through an OIC.
12    Q.  If a deputy thinks it rises to the level
13 that constitutes an offense and a CAB proceeding would
14 be appropriate, they would need to do an OIC?
15    A.  Correct.
16    Q.  If they didn't think it was rising to
17 that level but it was worth noting, then a log entry
18 would be appropriate?
19    A.  Correct.
20    Q.  Of the different kinds of reports -- we
21 talked about there was an information only and some
22 other kinds of reports that can be completed in the
23 TAG system -- if, in the deputy's mind, if constitutes
24 a chargeable offense, is the OIC really the way it's
25 supposed to be reported, or are there other reports

132

1 that are appropriate?
2    A.  The OIC is the way that it should be
3 reported.
4    Q.  Okay. Does the TAG system, to your
5 knowledge, have any kind of automatic deletion or
6 purging of old OIC reports after they're, you know, so
7 many years old or something of that sort?
8    A.  No.
9    Q.  So, so far as you know, any OIC report
10 ever completed in the TAG system should still be
11 available through the TAG system?
12    A.  Correct.
13    Q.  In general, the people that are in the
14 department's custody are not, at least, 100 percent
15 law-abiding individuals, are they?
16        MS. ALLEN: Objection. Form. But you
17 should answer.
18    A.  Everyone in our custody is presumed
19 innocent until they're found guilty.
20    Q.  (BY MR. MOORE) The inmates housed in the
21 county jail, are they generally posttrial or pretrial
22 or a pretty big mix of both?
23    A.  At the county jail for the men, they are
24 post. For the women, it's a mix.
25    Q.  And in the DDC, the men are primarily

33 (Pages 129 to 132)

Case 1:15-cv-02539-CMA-STV  Document 69-1  Filed 11/16/16  USDC Colorado  Page 6 of 6

ELIAS DIGGINS, CJM, CCE - 10/25/2016 - CONTAINS CONFIDENTIAL AND NONCONFIDENTIAL MATERIAL
Terri Eddy, et al.  v. City and County of Denver, et al.

125

1  that a deputy would select?
2     A.  It's autopopulated.
3     Q.  I've seen some of these reports that say
4  "outside" in a Location field.  Do you know generally
5  what that's going to refer to?
6     A.  It means it's not in one of the
7  facilities under the control of the sheriff's
8  department.
9     Q.  So it doesn't mean like outside of a yard
10 of a building.  It means outside of the department
11 essentially?
12    A.  Correct.  We still consider the yard part
13 of the facility.
14    Q.  And Location, is location on
15 autopopulate?
16    A.  No.
17    Q.  So the deputy does select the -- how to
18 fill that field in based on its specific location?
19    A.  Correct.
20    Q.  And then for Name, is the deputy already
21 logged in so that it automatically puts in their name
22 and ID, or is that something they fill in?
23    A.  It's automatic.
24    Q.  Because they're logged in as them
25 already?

126

1     A.  That's correct.
2     Q.  Okay.  And then under Staff Report,
3  there's a designation, Primary Report.  Does that mean
4  that it's sort of the initial report for a particular
5  incident?
6     A.  Yes.
7     Q.  Can a staff member do a subsequent report
8  on the same incident?
9     A.  We refer to them as "supplemental."
10    Q.  So if this were a second follow-up report
11 by the same deputy on the same incident, that would
12 say something like "supplemental report" there?
13    A.  Correct.
14    Q.  And are there other types of reports that
15 an investigating sergeant or someone else might submit
16 on the same incident number?
17    A.  Yes.
18    Q.  What other types of reports, you know --
19 what other types of reports can appear in this Report
20 Type field?
21    A.  Reports by other officers that were a
22 part of the incident.
23    Q.  But do you know what the names of those
24 reports are in the system?
25    A.  I don't recall exactly what we've titled

127

1  it, but I know that the reporting officer is
2  considered the primary reporter and the others are
3  additional reports.
4     Q.  So, like, if a second person witnessed
5  the same incident, instead of submitting a separate
6  incident report, they could submit a report on the
7  primary report -- or attach it to the primary report?
8     A.  With the same incident number.
9     Q.  Right.  And that would appear by some
10 name other than Primary Report?
11    A.  Correct.
12    Q.  And how about the sergeant?  When the
13 sergeant reviews and approves the report, do they fill
14 out some kind of report on the incident?
15    A.  The same thing.
16    Q.  Okay.  And how about -- say there's a CAB
17 process opened and there's an investigating supervisor
18 and the investigating supervisor submits some kind of
19 information on an incident.  Does that appear as a
20 report attached to this incident or does that appear
21 somewhere else?
22    A.  It could be attached to the incident
23 number.
24    Q.  Okay.  Is there somewhere else it could
25 be?

128

1     A.  If the supervisor that was doing the
2  investigation wanted to create a different incident
3  regarding their investigation, they could create a
4  different number, but generally it's attached to this
5  report.
6     Q.  And anytime I see a report that appears
7  on the screen that has these My Offenders and My Work,
8  and My Calendar and so forth buttons at the bottom, is
9  that going to be a TAG system report?
10    A.  Yes.
11    Q.  That's sort of the way the user interface
12 looks in the TAG system?
13    A.  Yes.
14    Q.  And because the deputy has logged in, the
15 My Offenders, the My Work, that means that particular
16 deputy's information associated with that particular
17 deputy, the buttons at the bottom?
18    A.  It means that's the information that that
19 particular deputy has access to based upon their
20 permission level.
21    Q.  And not necessarily anything to do with
22 the particular report -- or incident number -- excuse
23 me -- that's here?
24    A.  Correct.
25    Q.  And is there a way -- so suppose, you

32 (Pages 125 to 128)