IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 15-cv-02539-MSK-STV

TERRI EDDY,
REBECCA ESQUIBEL,
DENITA HARTZOG,
GIOVANNA KEMP,
LISA MAES,
PEGGY MAJOR,
COURTNEY MICKELSON,
SADIE MONTANO,
PAULA PURDY,
DASHAWN WALKER,
SAMONE WALKER,
STACI WRIGHT,
THERESA DENBOW,
CESQUA RASMUSSEN, and
RHONDA CASADOS,

Plaintiffs,

v.

CITY AND COUNTY OF DENVER, DENVER SHERIFF DEPARTMENT,

Defendant.

---

## THE CITY'S REPLY IN SUPPORT OF ITS
## MOTION FOR PARTIAL SUMMARY JUDGMENT [ECF. NO. 93]

---

Pursuant to Federal Rule of Civil Procedure 56, Defendant the City and County of Denver, the Denver Sheriff Department (together, "the City"), files its Reply in Support of Its Motion for Partial Summary Judgment [ECF No. 93]. Nothing in Plaintiffs' Response creates a genuine issue of material fact sufficient to withstand the entry of summary judgment in the City's favor.

I.    **THE CITY IS ENTITLED TO SUMMARY JUDGMENT ON THE HOSTILE WORK ENVIRONMENT CLAIMS ALLEGED BY PLAINTIFFS DASHAWN WALKER, SAMONE WALKER, HARTZOG, MONTANO, AND CASADOS**

   A.    **Plaintiffs' Response Fails to Raise an Issue of Material Fact Regarding Their Claims of Hostile Work Environment.**

Nothing in Plaintiffs' Response demonstrates that Plaintiffs' hostile work environment claims merit adjudication by a jury. To the contrary, Plaintiffs' efforts to survive summary judgment depend on misapplication of pertinent law, ignoring the context in which Plaintiffs' claims arise, blaming the City for not investigating alleged harassment that admittedly was not reported to the City, and a stretching of Title VII beyond its intended parameters.

First, Plaintiffs continue to encourage the Court to focus on the alleged experiences of non-parties and plaintiffs whose hostile work environment claims are not the subject of the City's Motion for Partial Summary Judgment, in an attempt to camouflage the lack of evidence supporting the claims of Plaintiffs Walker(s), Hartzog, Montano, and Casados. Specifically, in attempting to meet the severity/pervasiveness threshold, Plaintiffs rely primarily on the alleged experiences of harassment of Shannon Houghton (a non-party former deputy), Shayne Clapper (a non-party nurse), expert reports (which cannot be used to defeat summary judgment here), and plaintiffs whose hostile work environment claims are not the subject of the City's Motion.[1] While the totality of the environment is relevant in establishing a hostile work environment, Plaintiffs here proffer no evidence that Plaintiffs Walker(s), Hartzog, Montano, and/or Casados ever

---

[1] While the City has not moved for summary judgment on the hostile work environment claims of ten of the Plaintiffs, this is not, as Plaintiffs argue, a concession that those plaintiffs "have produced sufficient evidence of all elements to proceed to trial." (Response at 4). Instead, the City has evidence refuting the allegations of those remaining ten plaintiffs, but recognizes that proffering such evidence at this juncture only serves to create an issue of fact, rendering summary judgment inappropriate.

witnessed the alleged harassment of others or were told of those alleged acts of harassment during the time period they allege they were harassed, rendering such allegations irrelevant. *See Marks v. Sessions*, 2017 WL 4278498, *4-*5 (D.Colo. Sept. 27, 2017) (dismissing hostile work environment claims where "[m]any of the alleged sex-based comments were not, if ever, directed at Plaintiff" and there was no indication that Plaintiff was present for many of the explicitly sexual comments made to her co-workers); *Unal v. Los Alamos Public Sch.*, 638 Fed.Appx. 729, 737 (10th Cir. Jan. 29, 2016) (for harassment directed at others to be pertinent, the plaintiff must have been present when the harassment took place or made aware of the harassment during the time she was allegedly subject to a hostile work environment); *cf., Day v. Sears Holding Corp.*, 930 F.Supp.2d 1146, 1194 (C.D.Cal. 2013) (a plaintiff who was not the target of offensive remarks or touching may only recover if she establishes that she personally witnessed the remarks/touching and it took place in her immediate environment).

Plaintiffs' attempt to prove their harassment claims through the alleged experiences of others is especially ineffective in the corrections context.  In *Hicks v. Gates Rubber Co.*, 833 F.2d 1404 (10th Cir. 1987), where the Tenth Circuit held that evidence of harassment directed to employees other than the plaintiff can be relevant in determining whether the work environment is hostile, the alleged acts or harassment experienced by others were committed by a specific individual: the plaintiff's supervisor. *See id.* at 1416.[2]  Here, in direct contrast, there is no single perpetrator.  Because the inmate population is necessarily transient, alleged harassment by unidentified inmates directed towards an individual outside the presence or knowledge of a

---

[2] And, in any event, the *Hicks* decision explains that "evidence of specific hostility directed toward the plaintiff" was still critical. *See id.* at 1415.

Plaintiff is irrelevant in demonstrating the conditions of the Plaintiffs' employment.  *See Williams v. ConAgra Poultry Co.*, 378 F.3d 790, 794 (8th Cir. 2004) ("Because a subjectively hostile work environment is one that by definition the plaintiff is aware of, a plaintiff cannot recover for harassment of which he or she is unaware."); *Mason v. Southern Ill. Univ.*, 233 F.3d 1036, 1046 (7th Cir. 2000) ("Mean-spirited or derogatory behavior of which a plaintiff is unaware, and thus never experiences, is not 'harassment' of the plaintiff (severe, pervasive, or other))."  That a nurse who did not join this lawsuit may have allegedly been called a derogatory name by Inmate X does not bear on whether Plaintiffs – who were not there to witness this name-calling episode – experienced sexual harassment perpetrated by other inmates at other times.

On a related issue, it is noteworthy that the severity/pervasiveness element of a hostile work environment claim requires a plaintiff to establish that the alleged harassment was sufficiently severe or pervasive as to "alter the conditions" of her employment.  *See Harris v. Forklift Sys.*, Inc., 510 U.S. 17, 21 (1993); *see also Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998) (stating that the conduct "must be extreme to amount to a change in the terms and conditions of employment").  Plaintiffs ignore their burden that sustaining this showing in a prison setting differs markedly from making such a showing in a traditional corporate context.  *See Akines v. Shelby County Gov't*, 512 F.Supp.2d 1138, 1146 (W.D.Tenn. 2007) (explaining that "[c]onsideration of the [prison guards'] expectations of their work environment" is a relevant consideration in determining whether that environment was hostile).  To this end, the severity/frequency inquiry:

> requires careful consideration of the social context in which particular behavior occurs and is experienced by the target… The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.  Common sense, and an appropriate sensibility to social context, will enable courts and juries to distinguish

between simple teasing or roughhousing … and conduct which a reasonable person
in the plaintiff's position would find severely hostile or abusive.

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81-82 (1998).

Plaintiffs' attempt to muster sufficient facts demonstrating a hostile work environment on

the basis that "segregation of the workplace by the employer can contribute to a hostile work

environment" (Response at 7) fares no better.  In support of their argument that their alleged

"segregation" to shifts requiring inmate supervision (the primary responsibility of the position of

deputy sheriff) and to Building 21 contributed to their purportedly hostile work environment,

Plaintiffs rely on a Sixth Circuit case, *Jordan v. City of Cleveland*, 464 F.3d 584 (6th Cir. 2006),

which they state evidences a race-based hostile work environment claim "based primarily on

workplace segregation."  (Response at 7).   A review of *Jordan*, however, reveals that the claim at

issue was not based "primarily" on segregation but rather on the African-American plaintiff's

being called "Sambo" and a "Welfare Firefighter," and being subjected to numerous offensive

racial jokes and racist graffiti, including a "Wall of Hate" erected by his white colleagues where

they would write derogatory comments about the African American firefighters.  *See id*. at 589.

In any event, the City agrees that sexual harassment need not always be sexual in nature; however,

it must be severely egregious to a reasonable person so as to alter the working environment, a

showing that has not been made here.  As a result, Plaintiffs' inflated claim that "all female floor

deputies employed by the Department are subjected to a severe and pervasive hostile work

environment" (Response at 3) rings hollow, and cannot be used to survive summary judgment.

Related to Plaintiffs' deflection of the Court's attention to the alleged experiences of others,

Plaintiffs attempt to cure the most fatal weakness of their hostile work environment claim – their

failure to proffer facts sufficient to impute liability to the City for the acts of non-employee felons

– through a reliance on alleged OIC reports of harassment committed by specific inmates, submitted by non-parties to the lawsuit. Plaintiffs also make the contradictory argument that female deputies are discouraged from complying with the anti-discrimination policy set forth in the Inmate Handbook and therefore do not submit OIC reports regarding inmate harassment. Neither of these arguments remedies Plaintiffs' failure to alert the City to the harassment for which they seek redress in this Court.

Moreover, much of the "evidence" proffered to support Plaintiffs' arguments is based on the unverified expert report of Dr. Worley (*see* Plaintiffs' Response at pp. 38, 42, 45 and 49). Unverified expert reports are hearsay and not admissible for the purposes of summary judgment.[3] *Sewell v. Great N. Ins. Co.*, No. 06 CV 00223 WDM CBS, 2007 WL 1456133, at *8–9 (D. Colo. May 17, 2007), aff'd, 535 F.3d 1166 (10th Cir. 2008), *citing Sofford v. Schindler Elevator Corp.*, 954 F.Supp. 1459, 1462 (D.Colo. 1997); *see also Sparks v. Rittenhouse*, 2007 WL 987473, at *6 (D. Colo. Mar. 29, 2007), aff'd, 314 F. App'x 104 (10th Cir. 2008) (Chief Judge Marcia Krieger also citing *Sofford*, holding that "Unsworn assertions are not sufficient grounds to oppose a motion for summary judgment.").[4] In this case, the hearsay reports of all of Plaintiffs' expert witnesses,

---

[3] The Comments to the 2010 revision of F.R.C.P. 56 indicate that a party may object to inadmissible evidence within a summary judgment response or reply without having to file a separate motion to strike. *See* Comments to 2010 Revision/addition of new F.R.C.P. 56(c)(2).

[4] In the last 60 days, the Honorable Judge William J. Martinez has issued two decisions in which he parts with established law in this District and holds that expert reports do not have to be verified under the 2010 revised version of Fed.R.Civ.P. 56. *See Pertile v. General Motors, LLC*, 2017 WL 4237870 (D. Colo., Sept. 22, 2017) and *Sanchez v. Hartley*, 2017 WL 4838738 at FN 11 (D. Colo., October 26, 2017). This Court is not bound by these decisions and should not reach a similar conclusion. Even the "new" Rule 56(c)(2) states that a party may object that the material cited would not be admissible in evidence, as is the case here with hearsay expert reports. The Rule simply was not amended to include expert reports, as Rule 56(c)(1)(a) includes a laundry list of materials that may be used to support factual positions in a summary judgment motion and expert reports (verified or unverified) are not included in that list. Plaintiffs failed to provide any evidence that the report would be admissible at trial or that the information contained in the reports would be admissible at trial. As the comments to the 2010 Rule revision state, "[t]he burden is on the proponent to show that the material is admissible as presented or to explain the

including that of Dr. Susan Jones, are especially inappropriate for summary judgment because the parties have not yet been allowed to engage in expert discovery. Section 6.f.1 of the Amended Scheduling Order (ECF No. 61) states that the parties will not depose their respective expert witnesses until after dispositive motions are ruled upon on the case. Thus, Defendant has not yet had the opportunity to cross-examine and explore or test the alleged opinions of Plaintiffs' experts and, if appropriate, file a Rule 702 Motion. Because Dr. Worley's expert report is unverified and inadmissible hearsay, because expert depositions have not yet taken place to allow Defendant to determine whether a Rule 702 motion would be appropriate as to all of Plaintiffs' experts, the Court should not rely on any of the expert reports as competent summary judgment evidence.

Finally, Plaintiffs urge the Court to re-write the gender-neutral sexual harassment prohibitions contained in the Inmate Handbook, to impose special protections for female deputies. Specifically, Plaintiffs insist that sexual harassment of female deputies would stop, and that they would have been more likely to report alleged acts of inmate harassment, if the Inmate Handbook specifically identified "gunning masturbation" as prohibited inmate conduct. Yet Plaintiffs propose no similar conduct category applicable to instances of female inmate masturbation. "Title VII does not require employers to treat all people equally, rather, it prohibits employers from treating employees unequally" based on a protected category. *Freeman v. Kansas*, 128 F.Supp.2d 1311, 1321 (D.Kan. 2001). That Plaintiffs subjectively deemed it insufficient to charge acts of male masturbation under the available conduct violations – including "being disrespectful toward

---

admissible form that is anticipated." Plaintiffs did not even attempt to satisfy that burden in this case. Moreover, other judges in this District have continued to rule that unsworn statements are inadmissible for the purpose of summary judgment even after the Rule 56 revisions were made. *See, e.g., Pacheco v. Timme*, 2014 WL 2442111 at *4 (D. Colo., May 30, 2014) and *Pham v. Ahrens*, 2013 WL 5692408 at *10 (D. Colo. October 18, 2013), *report and recommendation adopted*, No. 12-CV-02155-RBJ-KLM, 2013 WL 5981677 (D. Colo. Nov. 12, 2013), *aff'd sub nom. Minh Pham v. Ahrens*, 569 F. App'x 559 (10th Cir. 2014)

or harassing a staff member" or "indecent exposure" – and that Plaintiffs did not think to write OIC reports based on inmates' violation of Inmate Handbook's provision that "all sexual behavior is prohibited" – demonstrates a failure by Plaintiffs, not an anti-female agenda on behalf of the City.

**B.    Plaintiffs' Response Does Not Save Deputy Samone Walker's Hostile Work Environment Claim.**

1.    Deputy Walker Has Not Demonstrated an Intolerable Workplace.

As set forth in the City's Motion, Deputy Walker cannot demonstrate the severity/frequency prerequisites necessary to demonstrate an intolerable work environment.  First, it is undisputed that Deputy Walker has been on medical leave or on light duty – during which she has no direct contact with inmates – during the majority of the past six years.  (*See* Ex. D at 24:6-8, 31:22-25, 32:1-1059:19-25, 60:1-2).   As evidenced during her deposition and confirmed in Plaintiffs' Response, her hostile work environment claim is primarily based on conclusory allegations and alleged generalized misconduct taking place during the brief interludes when she was off light-duty.   Other than vague generalities about inmates misbehaving "all the time," the only concrete references to alleged harassment that Deputy Walker recalls are: (a) witnessing male inmates "using the bathroom" (*Id*. at 108:18-25, 109:1, 112:24-25, 113:1-25, 114:1-20); (b) seeing male inmates masturbate (*see id*.); (c) being called derogatory names by male inmates when they grew angry (*see id*. at 39:5-10); and (d) male inmates gyrating their hips while being pat-searched, saying "do me first" (*see id*. at 62:6-16, 92:17-25, 93:1-21, 96:15-24).

Deputy Walker fails to satisfy her burden of establishing that these alleged instances were sufficiently severe or pervasive as to render her workplace intolerable.  Because Deputy Walker is unable to address the frequency of inmate harassment she experienced between the years 2010 and

2016 (*see id.* at 95:15-25, 96:1-24, 97:16-19, 119:11-25, 120:1-5), she must demonstrate that the above instances were sufficiently severe to alter the conditions of her employment. *See Sessions*, 2017 WL 4278498 at *6 (isolated instances are insufficient to support a hostile work environment claim unless they are "threatening and severe" or "especially egregious or extreme") (quoting *Morris v. City of Colorado Springs*, 666 F.3d 654, 666-67 (10th Cir. 2012)). Most incidents found to meet this standard involve "some kind of physical assault." *Id*.

Deputy Walker has proffered no evidence of any such incident (especially given that, when asked directly whether she had experienced any sexual harassment, let alone extreme harassment, she replied "no"). (*See* Ex. D, p.36) In fact, she cannot recall any specific instance of inmate masturbation between 2010 through 2016, undermining any claim of egregiousness.

Also speaking to the lack of egregiousness are Deputy Walker's statements regarding the most difficult aspects of her employment and suggestions for improvement throughout her tenure with the Department. In this regard, Deputy Walker does not dispute that she reported the most difficult aspect of her job in 2015 as "trying to get rounds done on time and the feed conducted with only 3 officers" and that her suggestions for improving were limited to adding more officers. (See Ex. D, pp. 37-40.). Nor does she dispute that in 2012, she had no suggestions for increasing her enjoyment or productivity on the job. (*See* Ex. D, p. 36.) All of this belies a showing of extreme harassment.

<div style="text-align:center">2. <u>Deputy Walker Does Not Dispute Her Failure to Report Any Alleged Harassment</u>.</div>

Most fatal to her claim of hostile work environment based on alleged actions committed by third parties, Deputy Walker proffers absolutely no evidence in support of imputing liability to the City. Significantly, Plaintiffs do not dispute that Deputy Walker did not report inmate

harassment – orally, in writing, or through OIC reports – to the City.  Instead, Plaintiffs sweep this fatal deficiency under the rug, arguing that her failure to report harassment is "irrelevant – or at the very least, not dispositive."  (Response at 25).  This argument is contrary to every decision analyzing sexual harassment claims brought by non-party inmates, which carefully evaluate whether a plaintiff reported harassment to the defendant institution, and what measures – if any – the institution took in response.  (*See* Motion at 19-22).

Further, Plaintiffs' attempt to excuse Deputy Walker's failure to report sexual harassment to the Department on the basis that "she was instructed not to file [OIC] reports regarding such conduct" is unavailing given that Deputy Walker testified that she also failed to notify the Department of harassment orally or through measures other than OIC reports.  (*See* Ex. D at 46:8-24, 51:18-25, 52:1-16, 58:17-23, 59:14-18, 71:17-19, 117:16-21).  Finally, Deputy Walker does not dispute that she responded in the negative to Department questions regarding whether she experienced or witnessed sexual harassment in the workplace.  (*See id*. at 135:2-11; Ex. D, p. 36.).  The City has been unable to find any decision finding liability where a plaintiff who failed to report harassment was nevertheless asked by her employer about harassment, and she answered (untruthfully) that she had not seen or experienced any such harassment.  Given the dearth of evidence supporting vicarious liability of the City for the alleged misconduct of third parties, Deputy Walker's hostile work environment claim must be summarily adjudicated in favor of the City.

**C.   Plaintiffs' Response Fails to Demonstrate an Issue of Fact Precluding Summary Judgment on the Hostile Work Environment Claim of Deputy DaShawn Walker.**

1.   <u>Deputy Walker Has Not Demonstrated an Intolerable Workplace</u>.

Plaintiffs admit that Deputy Walker experienced "little" sexual harassment in 2016. Deputy Walker recalls two acts of inmate masturbation that took place in 2015 (one of which was a private, discrete act performed in the dark), and name-calling. (*See* Ex. E at 143:13-16, 151:2-11, 143:17-25, 144:1-25, 146:7-20, 147:17-20). Deputy Walker states that inmate masturbation took place in 2014, but she cannot recall any particular incidents, and she was also called names by inmates that same year when the inmates did not like being told "no" or did not like being forced to follow the rules. (*Id*. at 154:19-25, 155:1-11,131:2-4).

As her sister Samone Walker, Deputy Walker fails to proffer evidence that the above alleged harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment. This showing is especially difficult to make given the undisputed fact that Deputy Walker chooses to work in male housing units for her overtime shifts. (*See id.* at 16:5-9).

2.   <u>Deputy Walker Does Not Dispute Her Failure to Report Any Alleged Harassment</u>.

Plaintiffs do not dispute that Deputy Walker did not report any of the above alleged harassment to the City. Plaintiffs attempt to justify this omission based on Deputy Walker's testimony that she does not report harassment "because those inmates are going to come back to the same pod where nothing is done at all or they tell you to give them a constructive work assignment." (Response at 24). Yet this would not explain Deputy Walker's failure to report the

first act of alleged harassment.   Nor does this excuse explain why Deputy Walker told the Department in 2012 that she had not experienced or witnessed sexual harassment in the workplace.  (*See* Ex. E, p. 25.; Ex. Eat 193:5-24).   One cannot seek to hold an employer liable for sexual harassment that an employee has denied existing.  The Court should decline Plaintiffs' invitation to expand the concept of vicarious liability such that an employer will be held liable for unreported third-party conduct.

      **D.**    **Plaintiffs' Response Fails To Create an Issue of Fact on the Hostile Work Environment Claim of Deputy Hartzog**.

                1.    <u>Deputy Hartzog Proffers No Evidence of an Intolerable Workplace</u>.

Plaintiffs misrepresent Deputy Hartzog's testimony in an effort to create an issue of fact to withstand summary judgment on her hostile work environment claim.   Yet they cannot evade the fact that Deputy Hartzog is not subjectively offended by the harassment she has experienced since 2011, a prerequisite to an actionable claim of hostile work environment.  (*See* Ex. F at 61:15-25, 62:1-6); *Williams v. Universal Enter., LLC*, 2008 WL 2390 818, *2 (W.D.Okla. June 9, 2008). The lack of offense of Deputy Hartzog by inmate conduct occurring subsequent to 2011, when a physical change to the building alleviated her concerns, coincides with the lack of OIC reports submitted by Deputy Hartzog after 2011.  (*See* Ex. F at 64:15-21, 65:21-25, 69:21-25, 70:1-9, 70:14-25, 71:1-8, 71:17-25, 72:1-16, 99:12-25).   Given her failure to file reports after 2011, and her admission that she does not deem inmate behavior since that time to be harassing, Deputy Hartzog has not proffered evidence sufficient to impute liability to the City for the alleged sexual harassment of inmates.

Plaintiffs try to circumvent Deputy Hartzog's admission that she does not subjectively feel harassed on the basis that "harassed" does not mean "sexually" harassed, but rather "harassed" as

a non-sexual offense in the Inmate Handbook. (Response at 19). This argument puts words in Deputy Hartzog's mouth and grossly misrepresents the substance of Ms. Hartzog's testimony. (*See* Ex. F at 61:15-25; 62:1-14). It also contradicts the following testimony:

> Q:    Okay. And I want to know specifically as to the masturbating. Can you give me an example of when it crossed the line to sexual harassment of you?
>
> A:    I cannot give you that example. That was something that I was more exposed to when I was earlier in my career. On fifth watch now not so much.

(*See id*. at 64:15-21). Because Plaintiffs fail to proffer sufficient evidence that Deputy Hartzog was subjectively offended by the above alleged inmate behavior, summary judgment must enter in favor of the City.

   2.   <u>Plaintiffs Do Not Dispute That Deputy Hartzog Has Not Reported Harassment Since 2011, and That Each Time She Did, the Department Responded Appropriately</u>.

Tellingly, Plaintiffs omit any argument regarding whether Deputy Hartzog has proffered sufficient facts to impute liability to the City, appearing to concede that she has not. Unlike most of her co-Plaintiffs, Deputy Hartzog did report male inmate masturbation to the Department through OIC reports in 2011 or before, charging those male inmates under the "exposure" violation set forth in the Inmate Handbook. (*See* Ex. F at 62:12-14, 65:21-25, 69:21-25, 70:1-9, 70:14-25, 71:1-8, 71:17-25, 72:1-16, 82:4-22). It is undisputed that when Deputy Hartzog submitted such OIC reports, the Department responded appropriately, reviewing the reports and imposing penalties against the offending inmates "determined by the degree of threat." (*See id*. at 70:24-15, 71:1-8, 72:18-21). Consistent with the foregoing, Deputy Hartzog does not recall any instance in which the Department did not respond to her reports of inmate masturbation. *(See id*. at 74:14-

18). Plaintiffs do not dispute that Deputy Hartzog did not report any other type of sexual harassment to the Department.

There is no basis to hold the City liable for third-party conduct (*i.e.* inmate conduct) where: (1) the complained of conduct was not reported; and (2) when the conduct was reported, it was addressed and penalties imposed against the third parties where warranted. Plaintiffs appear to have abandoned the issue of whether the City can be held liable for the sexual harassment claims alleged by Deputy Hartzog. *See, e.g., Doty v. City & County of Broomfield*, 2013 WL 5510646, *9 n.6 (D.Colo. Oct. 4, 2013) (noting that the plaintiff "appears to have abandoned his ratification argument as he does not include it in his response to defendants' motion for summary judgment."); *Abdulsalaam v. Franklin County Bd. of Comm'rs*, 637 F.Supp.2d 561, 578 (S.D.Ohio 2009) ("Plaintiffs do not clearly respond to that argument in their brief and that failure alone warrants summary judgment in Defendants' favor on that issue"). Summary judgment must issue in favor of the City on Deputy Hartzog's hostile work environment claim.

> **E.** **No Issue of Material Fact Precludes Summary Judgment on the Hostile Work Environment Claim of Deputy Montano**.

> 1. Deputy Montano Proffers No Evidence of an Abusive Work Environment.

Plaintiffs do not dispute that Deputy Montano has been allegedly harassed fewer than ten instances in 23 years, which breaks down to roughly once every two years. Because none of these alleged instances involved physical assault or egregious behavior, summary judgment should issue on this basis alone. *See Sprague v. Thorn Am., Inc.*, 129 F.3d 1355, 1365-66 (10th Cir. 1997) (concluding that "five separate incidents of allegedly sexually-oriented, offensive comments either direct to [the plaintiff] or made in her presence in a sixteen-month period" were not sufficiently pervasive to support a hostile work environment claim).

Given this obstacle, Plaintiffs argue that Deputy Montano has proffered evidence of severity/pervasiveness necessary to survive summary judgment on the grounds that she has been "segregated" into Building 21, where she supervises female inmates. (Response at 21). Yet the assignment of Deputy Montano to a female-only building only reinforces the lack of sexual harassment she has experienced on the job. Simply put, Deputy Montano fails to demonstrate an intolerable work environment, warranting the entry of summary judgment in favor of the City.

        2.    <u>Plaintiffs Do Not Dispute Deputy Montano's Failure to Report Alleged Harassment</u>.

Even more detrimental to Deputy Montano's claim of hostile work environment, Plaintiffs do not dispute that Deputy Montano has reported sexual harassment only once during her 23-year tenure with the Department, in 1996 or 1997. Plaintiffs attempt to excuse this failure on the grounds that Deputy Montano "had seen early in her career that writing reports for abusive inmates was a wasted effort." (Response at 20). This is contrary to Deputy Montano's own testimony that the one time she submitted an OIC report regarding a misbehaving inmate, the Department held a CAB hearing on the alleged misconduct. (*See* Ex. G at 98:8-25). Deputy Montano does not know whether the inmate was found guilty, or the outcome of that hearing. (*See id*. at 99:7-12). Dissatisfaction with the Department's response to her sole report of inmate harassment – especially where she does not know what transpired during the inmate's disciplinary hearing – does not justify the failure to report further acts of harassment to the Department.

Also fatal to Deputy Montano's attempt to impute liability to the City for the conduct of inmates, is that she was untruthful in answering the Department's question during her March 2012 review about whether she had experienced or witnessed sexual harassment. Plaintiffs do not dispute that Deputy Montano answered "no" because "I don't believe there's any consequences."

(*Id.* at 146:23-25, 147:1-9).  Under no circumstances should the City be held liable for third-party conduct when a plaintiff actively engaged in misrepresentation regarding such conduct to the Department.  The Court must enter summary judgment in favor of the City on Deputy Montano's hostile work environment claim.

### F.   Plaintiffs' Response Fails to Cure the Deficiencies in the Hostile Work Environment Claim of Deputy Casados.

#### 1.   Deputy Casados Does Not Demonstrate an Intolerable Work Environment.

It is undisputed that Deputy Casados recalls only three out of 20 alleged acts of masturbation she claims to have witnessed over a 12-year period with the Department, one of which she first glimpsed over a security camera, and one of which stopped upon her request.  (*See* Ex. H at 27:22-25, 28:1-24, 32:4-24, 33:23-25, 34:1-8).  This is insufficient to establish a hostile work environment. *See Sprague*, 129 F.3d at 1365-66.  Deputy Casados also does not dispute that she authored only three OIC reports documenting that she was called derogatory names by inmates. Instead, Plaintiffs defend this "relatively small" number of OIC reports by arguing that the Department actively discouraged female deputies from reporting sexually harassing behavior. (Response at 17).  As such, the record evidence supports that the alleged harassment experienced by Deputy Casados was not sufficiently frequent or egregious to alter the terms and conditions of her employment.

#### 2.   Deputy Casados Does Not Dispute That She Submitted Only Three OIC Reports Regarding Alleged Inmate Harassment.

Plaintiffs attempt to gloss over the fact that Deputy Casados submitted a "relatively small" number of OIC reports regarding sexual harassment.  (In fact, she filed only three such OIC reports, each of which was promptly addressed and acted upon by the City.  *See* Ex. H, pp. 14, 15, 17.))

In particular, Plaintiffs state that Deputy Casados filed such few OIC reports regarding inmate harassment because "the Department actively discouraged female deputies from reporting sexually harassing behavior." (Response at 17). This explanation, however, contradicts Deputy Casados' own testimony that no one at DSD ever instructed her not to write an OIC report regarding inmate harassment. (*See* Ex. H at 34:23-25).

Plaintiffs do not even attempt to address the statements Deputy Casados made to the Department during her annual Performance Reviews. She told the Department during her 2016 review that she had not experienced or witnessed sexual harassment during the previous six months (*see* Ex. H, p. 26.), described the most difficult aspect of her job as needing patience with officers and inmates in 2012 (*see* Ex. H, p. 24), and listed the "moods of Deputies" as the most difficult aspect of her job in 2013 (*see* Ex. H, p. 25). To hold the City liable not only for harassment that Deputy Casados did not report, but for harassment that Deputy Casados denied experiencing, would be contrary to every decision regarding vicarious liability for third-party conduct. Summary judgment should enter on Deputy Casados's claim.

## II.      THE CITY IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS OF DISPARATE TREATMENT DISCRIMINATION.[5]

A plaintiff proves a disparate treatment violation of Title VII **either** by direct evidence of discrimination **or** by following the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Plaintiffs' Response fails to provide sufficient evidence to satisfy either test.

---

[5] With the exception of Deputy Casados, every Plaintiff has asserted a claim of disparate treatment discrimination.

A.     **Direct Evidence**

1.     Direct Evidence Generally

"Direct" evidence "refers to a narrow category of 'evidence, which if believed, proves the existence of a fact in issue without inference or presumption.'" *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1000 n. 8 (10th Cir. 2011) (quoting *Hall v. U.S. Dep't of Labor*, 476 F.3d 847, 854 (10th Cir. 2007)).   Direct evidence is "usually impossible to obtain in the employment-law context when the fact in issue is the employer's motivation for a particular employment decision." *Twigg*, 659 F.3d at 1000 n.8 (internal quotations omitted).   Direct evidence of employment discrimination is generally limited to "an admission by the decisionmaker such as 'I fired him because he was too old.'" *Twigg*, 659 F.3d at 1000 n.8 (quotation omitted). Direct evidence must "speak directly to the issue of discriminatory intent" as well as "relate to the specific employment decision in question." *Chytka v. Wrigth Tree Serv., Inc.*, 925 F. Supp. 2d 1147, 1162 (D.Colo. 2013) (citation omitted). "A statement that can plausibly be interpreted two different ways—one discriminatory and the other benign—does not directly reflect illegal animus, and, thus, does not constitute direct evidence." *Hall*, 476 F.3d at 855 (quotation omitted).

2.     Plaintiffs Provide No Direct Evidence of Discrimination Based on Post Assignments.

Plaintiffs' "direct evidence" argument fails to cite any direct evidence and misstates the indirect evidence. For example, Plaintiffs claim that deputies working overtime are usually allowed to choose which posts they are assigned, so they pick posts outside of housing units. Response pp. 60-61.   Plaintiffs do not cite to any direct evidence of this, such as deposition testimony of any of the Plaintiffs.   Instead, Plaintiffs rely on an unsworn expert report and

misconstrued deposition testimony of Sgt. Bowen.  Neither evidence allows Plaintiffs to escape summary judgment.

With regard to the unsworn expert report of Pacey Economics, for the same reasons discussed *supra* in Section I.A at p. 6 regarding Dr. Worley, the Pacey expert report is inadmissible hearsay, not competent summary judgment evidence, and Plaintiffs fail to establish how or why the content of the expert report would be admissible at trial. *See* Section I.A. at p. 6; *see also* Fed.R.Civ.P. 56(c)(2) and the comments thereto ("The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated"); *Sewell v. Great N. Ins. Co.,* No. 06 CV 00223 WDM CBS, 2007 WL 1456133, at *8–9 (D. Colo. May 17, 2007), aff'd, 535 F.3d 1166 (10th Cir. 2008), *citing Sofford v. Schindler Elevator Corp.,* 954 F.Supp. 1459, 1462 (D.Colo. 1997). Moreover, the Pacey Report does not equate to direct evidence, as it requires presumptions made from the data contained therein.  Plaintiffs first make the presumption, based on statistics in the Pacey report, that deputies choose to work overtime in posts outside of housing units.  Based on the first presumption that deputies actually choose the posts, Plaintiffs make a second presumption, that because deputies make the choice to work their overtime posts outside of housing units, then working in housing units must be less demanding and more desirable. Response, p. 61.  These presumptions are made regarding deputies' choices, rather than, say, presuming that the deputies' choices were made based on the posts that were available.  These presumptions simply cannot equate to direct evidence.  *Twigg*, 659 F.3d at 1000 n.8 (internal quotations omitted).

Plaintiffs also quote from Sergeant Heinrich's deposition, but while Sergeant Heinrich did state that posts outside of housing units are generally less demanding, he made no statement

regarding whether some posts are more desirable than others.  Ex. 35 at 49:3-17.  Sergeant Heinrich's testimony requires a presumption or inference that because housing units are more demanding, they must therefore be less desirable.  This is yet another impermissible inference and not direct evidence.

Plaintiffs assert that male deputies working overtime almost always choose a post in Building 19 where there is a lower inmate-to-staff ratio.  Response p. 61.  Plaintiffs then compare that ratio to Building 21 which they claim is understaffed.  *Id.*  Plaintiffs cite to Sergeant Bowen's deposition, however, Sergeant Bowen made no statement about **male** deputies choosing to work Building 19 and said nothing about such choices being made based on the inmate-to-staff ratio.  Instead, the question posed to Sergeant Bowen was, "Was Building 19 generally a more popular choice **for people** working overtime **than Building 24**?"  Ex. S (attached hereto), at 81:15-16 (emphasis added).  Sergeant Bowen agreed.  *Id.* at 81:17. When asked why that was, Bowen responded, "Because they get to sit with other officers and communicate with them." *Id.* at 81:19-20.  Plaintiffs also try to rely again on statistics from their expert, Pacey Economics.  However, those statistics require the same presumptions discussed above and, therefore, are not direct evidence.

### 3. Defendant's Cross-Gender Supervision Policy was Properly Enforced.

Defendant has a Cross-Gender Supervision policy stating there will be no assignment of posts or duties based on gender, except where the privacy of a prisoner mandates supervision by officers of the same sex.  Motion p. 9-10, Ex. A-2.  Plaintiffs do not challenge Defendant's policy, but instead allege that Defendant cannot rely on its policy as a defense when its actions violate that policy.  However, as this Court held, "Title VII does not require employers to enforce their policies

as they are written, so long as whatever enforcement of the policy that actually does occur occurs without discrimination." *Elson v. Colorado Mental Health Inst. at Pueblo*, Civil Action No. 09-cv-01375-MSK-CBS, 2011 WL 1103169, *6 (D.Colo. Mar. 24, 2011).

Plaintiffs offer a lengthy discussion of staffing practices that they allege  are in violation of the Cross-Gender Supervision Policy.  Plaintiffs' assertions are not direct evidence of gender discrimination.  Plaintiffs do not provide any evidence that Defendant was motivated to assign them to certain posts with the intent to discriminate against them.  Direct evidence must "speak directly to the issue of discriminatory intent." *Chytka*, 925 F.Supp.2d at 1162.

Plaintiffs' assertions also fail because there are no admissions by Defendant's decision-makers even suggesting that Plaintiffs or any other female deputies were assigned certain posts with the intent to discriminate against them because they are female.  *Twigg*, 659 F.3d at 1000 n.8 (admissions by a decision-maker may constitute direct evidence).  Rather, those decision-makers testified that post assignments were made taking the privacy of the inmates into consideration and the duties needing to be performed. Ex. T, attached hereto, at 67:14-24; 69:24-71:1; 72:3-16. Assignments in Building 21 (the female housing unit) were made considering that all of the posts in Building 21 are required to pat-search inmates and to be able to conduct strip-searches. *Id.* Therefore, because men are not able to do such searches of female inmates, the female deputies have to pick up those extra duties if men are assigned there. *Id.*  Similarly, male deputies have to take up additional searches of male inmates if female deputies are assigned to male housing units. Ex. T, attached hereto, at 74:11-21.  Female deputies are generally assigned to supervise female inmates so that male deputies are not watching female inmates take showers. Ex. 57. Therefore,

the post assignments are not made because deputies are of a certain gender, but because of the private nature of some of the duties that must be performed with inmates.

### 4.      Sgt. DeNovellis' Testimony Does Not Create a Fact Issue.

Relying on the deposition testimony of Sergeant DeNovellis, Plaintiffs contend there is direct evidence of discrimination because "some sergeants continue to assign only women to staff female housing units, to the extent possible." Response pp. 64.

Sergeant DeNovellis did testify in his deposition that they try to put female officers supervising female prisoners. However, Plaintiffs omitted his testimony regarding the basis for this practice: "to protect the male deputies from being accused of sexual assault or any various crimes," (Ex. 32 109:15-18) and because "it is preferred to avoid issues with [inmate] complaints" (Ex. 32 112:5-10). Therefore, Sergeant DeNovellis did not make a direct statement that the assignments were done because of the gender of Plaintiffs, but rather for liability reasons. Because the Court could interpret Sergeant DeNovellis' testimony in multiple ways (*e.g.*, that Sergeants made gender-based assignments to avoid liability or to discriminate against female deputies), this is not direct evidence. *See Ali v. Jerusalem Restaurant, Inc.*, Civil Action No. 14-cv-00933-MEH, 2015 WL 1384372, *3 (D.Colo. March 23, 2015) (unpublished) (no direct evidence where there was a plausible interpretation that the statement was benign and not discriminatory).

### 5.      There is No Direct Evidence Regarding Staffing in Other Posts.

Plaintiffs also complain about the staffing of Building 19 which houses male work release inmates. Response p. 65. Sergeant Bowen testified that female deputies do not work in Building

19[6] because "all of the inmates as they go in and out have to be strip searched." Ex. 15 57:23-58:6.

The same is true of the kitchen[7] posts (Response pp. 64-65) which also supervise male inmates.

Ex. 15 50:11-51:8. Again, assignments based on duties that have to be performed (strip searching

male inmates) is not direct evidence of discrimination because it does not speak directly to an

intent to discriminate against Plaintiffs.  *See Chytka v. Wright Tree Serv., Inc.*, 925 F. Supp. 2d

1147, 1162 (D.Colo. 2013), *aff'd*, 617 F.App'x 841 (10th Cir. 2015) (quotation omitted) (evidence

must "speak directly to the issue of discriminatory intent" as well as "relate to the specific

employment decision in question").  There may have been direct evidence if a decision-maker had

stated he did not think women were capable of working in the kitchen regardless of the duties to

be performed.  Similarly, Plaintiffs claims about the staffing of Building 24-Charlie are not direct

evidence because there is room for interpretation – Bowen stated he does not know why women

did not work there and other witnesses interpreted it was because of the physical layout of the

building.  Response p. 65.

      6.     There is No Direct Evidence on Training or the Practice of Sergeants Making the Post Assignments.

Plaintiffs go on to assert that assignments are done incorrectly because Defendant does not

provide training "regarding when the privacy of a prisoner mandates supervision by a deputy of

the same sex."  Response p. 65.  As such, Plaintiffs are admitting there is no direct evidence

because the reasoning for the post assignments is a benign reason without intent -- prisoner privacy.

---

[6]  Plaintiffs make a self-serving statement that Building 19 is the "one housing unit pleasant enough to work in that male deputies often choose those posts, while working overtime."  Response p. 64.  However, Plaintiffs provide no evidence in support of this conclusory statement.

[7]  Interestingly, Plaintiff Hartzog testified that she did not want to work in the kitchen because there are a lot of incidents and fights in the kitchen.  Ex. 16, 31:10-17.  Therefore, this was not a desired post for her.  This is evidence of the subjectivity of which posts are desirable.

Furthermore, even if there was no training regarding the policy, there is no evidence that the intent of not providing training was to discriminate against female deputies.  As such, there is no direct evidence.

Plaintiffs claim there is direct evidence of discrimination because the sergeants are "left to work out for themselves which posts should be assigned on a 'gender-specific basis'" and they believe they can make "sex-based assignments to any post."  Response p. 66.  Again, as stated, the posts are based on inmate privacy and none of the sergeants provided testimony that there was an intent to discriminate against female deputies when making post assignments.

Plaintiffs claim that Sergeant Lombardi testified that he favors assigning male deputies to "highly sought-after" corridor posts because they are better able to break up fights among inmates.  Response p. 66.  First, Plaintiffs provide no evidence that these posts are "highly sought-after."  Second, Plaintiffs misconstrue the testimony.  Sergeant Lombardi's actual testimony was, "Yes and no.  Yes, I would prefer to always try to have at least one male responding officer [in emergency situations], especially to the male facilities. But it's never specifically all of them or both of them, at least one male to assist in responding to emergencies in the male buildings."  Ex. 3 158:17-22.  Furthermore, comments in the workplace that reflect personal bias do not qualify as direct evidence of discrimination unless the plaintiff shows the speaker had decision-making authority and acted on his or her discriminatory beliefs. *Ramsey v. City & Cnty. of Denver*, 907 F.2d 1004, 1008 (10th Cir.1990).  There is no evidence that sergeants had any decision-making authority.

7.    <u>Assignments to Building 21 and Relief Posts are Themselves Not Direct Evidence</u>.

Plaintiffs assert that segregating female deputies in female housing posts and denying them posts with less inmate supervision is direct evidence of discrimination.  Again, an act or statement that can be interpreted two different ways – one discriminatory and the other benign – does not constitute direct evidence.  *Hall*, 476 F.3d at 855.  As discussed extensively above, the basis for post assignments is the privacy of inmates including the duties of pat-searching and strip-searching, and protection from allegations of sexual assault.  Ex. 32 109:15-18; Exhibit U, attached hereto, 67:14-24; 69:24-71:1; 72:3-16, 74:11-21.  These are benign reasons for post assignments and, therefore, there is no direct evidence in this case.

**B.    PLAINTIFFS ALSO FAIL TO MEET THEIR BURDEN UNDER *MCDONNELL-DOUGLAS*.**

A plaintiff proves a disparate treatment violation of Title VII either by direct evidence of discrimination or by following the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  As discussed in the previous section, Plaintiffs failed to present direct evidence, *i.e.* any evidence that didn't require a presumption.   However, Plaintiffs cannot succeed under the *McDonnell Douglas* rubric, either. Under that framework, one of the elements Plaintiffs must prove is that they suffered an adverse employment action.  *Id.* [8]

---

[8] Plaintiffs state at page 56 of their Response that they are relying on direct evidence through Part B of their Response which appears from pages 60-78 and relying on adverse actions under *McDonnel Douglas* for Part C of their Response which begins on page 79 of the Response.  However, Plaintiffs' discussion of adverse actions actually begins on page 67 of the Response with, "Segregation into Building 21 is an adverse employment action."  Furthermore, Plaintiffs state that if the Court determines Defendant has not made "admissions" that it made assignments based on sex, Plaintiffs still have enough circumstantial evidence to support an inference of discrimination.  Response p. 67 n. 15. As such, Defendant will respond to pages 67 through 82 using the *McDonnel Douglas* framework.

Plaintiffs claim that segregating them into Building 21 and denying them posts with less inmate supervision results in the adverse actions of "fundamentally different and less desirable job duties, reduced chance of advancement, and increased workload, danger, and burnout."  Both of these arguments fail as a matter of law.

1.      Being Assigned to Building 21 is Not an Adverse Action.

Plaintiffs claim that being assigned to Building 21 is an adverse action because Building 21 places greater demands on the deputies assigned to it and because it limits employment opportunities.

a.      **Allegedly Greater Work Demands are Not an Adverse Employment Action.**

Plaintiffs claim that being assigned to Building 21 is an adverse action because Building 21 places greater demands on the deputies assigned to it.  Defendants disagree with this contention, but for purposes of this Motion only, Defendant assumes the allegation to be true.

An adverse employment action may include a "significant change in employment status, such as . . . reassignment with significantly different responsibilities."  *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 636 (10th Cir. 2012). Plaintiffs do not assert assignment to Building 21 is a reassignment to a different position with significantly different responsibilities. Plaintiffs serve as Deputy Sheriffs regardless of the building to which they are assigned. Plaintiffs are simply saying that they think Building 21 is more difficult than other posts.  Plaintiffs discuss the duties performed in Building 21 including searching inmates that return from work release and court; escorting medical personnel during rounds; supervising inmates of all security levels; and supervising inmates during rehabilitation programs, in the transition unit, during meals, while they do laundry, participating in GED classes, and during recreation.   All of these duties, however, are

part of the day-to-day functions of all deputies, including male deputies.  Ex. A-1.  Being required

to perform duties within an employee's job description is simply not an adverse action.  *Glapion*

*v. Castro*, No. 14-CV-01699-MEH, 2015 WL 7253331, at *30 (D.Colo. Nov. 16, 2015), *aff'd*, 646

F.App'x 668 (10th Cir. 2016) (while some duties changed, all duties were within the job description

and, therefore, change in duties was not an adverse action).

Plaintiffs' reliance on *Piercy v. Maketa,* 480 F.3d 1192 (10th Cir. 2007) is misplaced.

*Piercy* is inapposite because it involved a written policy, held to be discriminatory on its face, of

not allowing female deputies to transfer to posts housing only male inmates. *Id*. at 1204.  The case

at bar does not involve such a policy, nor is there an allegation that Plaintiffs were prohibited from

working in male inmate housing units.  Furthermore, "[i]n *Piercy*, [the court] held the employer's

assignment of certain duties to only some employees holding the same position did not rise to the

level of an adverse employment action. [*Piercy*], 480 F.3d at 1204 n. 13." *Faragalla v. Douglas*

*Cty. Sch. Dist. RE 1*, 411 F.App'x 140, 156 (10th Cir. 2011).  Specifically, *Piercy* held "[t]he

additional duties of patting down the female inmates at CJC (which the male guards did not have

to do) does not rise to the level of an adverse employment action." *Piercy*, 480 F.3d at 1204 n. 13

As such, the fact that all of the duties of a deputy occur within the confines of Building 21,

but the same duties are spread to various locations when dealing with male inmates does not create

an adverse action.  *See Jones v. Barnhart*, 349 F.3d 1260, 1269-70 (10th Cir. 2003) (employee's

generalized and unsubstantiated claims of an increased workload were insufficient to rise to the

level of an adverse employment action).

Plaintiffs' claim also fails there is no evidence of the next element of a *prima facie* case,

that the adverse action was taken in circumstances giving rise to an inference of discrimination.

Such an inference could include "actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus." *Plotke v. White*, 405 F.3d 1092, 1101 (10th Cir. 2005). Here, the evidence is that assignments to Building 21 were made taking into consideration that female inmates can only be pat-searched and strip searched by female deputies; female inmates may accuse male deputies of sexual assault and other complaints by the female inmates against the male deputies. Ex. 32 at 109:15-18; Ex. T, attached hereto, at 67:14-24; 69:24-71:1; 72:3-16, 74:11-2.

### b. Plaintiffs Fail to Provide Evidence that Being Assigned to Building 21 Limited Their Employment Opportunities.

Plaintiffs allege that being assigned to Building 21 is an adverse action because it limits employment opportunities, but their Response does not provide any actual evidence thereof. Plaintiffs claim that "having broad experience in the Department helps advance up the ranks to sergeant[9] and beyond," and "[b]eing segregated to a largely single housing unit is inconsistent with gaining that sort of broad experience, and therefore will tend to limit employment opportunities." Response p. 72. These are entirely conclusory allegations. *See Fierro v. Norton*, No. 05-2012, 152 F.App'x 725, 729 (10th Cir. 2005) (employee's speculation about being prevented from obtaining higher-level job was insufficient to withstand summary judgment); *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1041 (10th Cir. 2011) (the mere possibility that employee's HIV status could have adversely affected his employment at some unknown time in the future is not enough to support a claim); *Dick v. Phone Directories Co.*, 397 F.3d 1256, 1269 (10th Cir. 2005)

---

[9] Plaintiffs admonish Defendant for suggesting that Plaintiffs have a claim for not being promoted to Sergeant. Response p. 60 n. 12. Plaintiffs admonishment is confusing in light of the following allegation of their Second Amended Complaint: "Because female deputies have fewer opportunities to gain those broad experiences, especially through special assignments, they have fewer opportunities for promotion to **sergeant** and further career advancement." Doc. 65 ¶ 57, emphasis added.

(filing of police report by co-workers where no formal charges were filed did not "carr[y] a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects." (internal quotation omitted)).

There is no evidence that working in Building 21 limited any of Plaintiffs' employment opportunities.  None of the 15 Plaintiffs identify a single "employment opportunity" that they sought that was denied to them because of the amount of time they spent in Building 21.  Sergeant Lombardi testified that there was no requirement to have "broad experience within the Department" in order to "advance, get promoted to Sergeant."  Ex. 3 at 29:21-25.  Division Chief Connie Coyle testified that "many people have been promoted straight from the floor [housing unit]" and that "[t]here are no promotion points, . . . additional points for being part of a specialty unit [not a housing unit]."  Ex. U, attached hereto, at 27:5-6, 38:16-21. There is no evidence that working in Building 21 versus another assignment was even considered in deciding who should receive other employment opportunities, including promotions.

2.      Denial of Relief Posts Is Not an Adverse Action.

Plaintiffs have a section of their brief titled, "Systematic denial of relief posts is an adverse employment action."  Response p. 73.  Plaintiffs do not define what is meant by "relief posts." However, the substance of the section seems to suggest that Plaintiffs want to work posts in the jails that do not involve "inmate supervision."  Response p. 74.  Plaintiffs discuss posts such as "emergency relief posts," "control tower," and "corridor security posts,"[10] which they claim do not "involve continual inmate supervision."  *Id.*  However, direct and continual inmate supervision

---

[10]   Plaintiffs do not provide any actual evidence regarding the actual tasks involved in posts that they claim do not involve continual inmate supervision.  Response pp. 74-76.

is the very job that all deputies are tasked with performing (Ex. A-1) and contrary to Plaintiffs' suggestion, is the task preferred by some deputies (Ex. 33 at 58:5-8). Furthermore, as already stated, being required to perform duties within the job description is not an adverse action (*Glapion*, 2015 WL 7253331, at *30) and subjective reasons for believing that another assignment is more desirable does not constitute an adverse action (*Carrero v. Robinson*, No. CIV.A. 05-cv-02414-MSK-CBS, 2007 WL 1655350, at *14 (D.Colo. June 5, 2007)).

Although somewhat unclear, it appears that Plaintiffs assert being denied posts with less inmate supervision is an adverse action because continual inmate supervision is "stressful and dangerous."[11] Response p. 74. This is essentially a continuation of Plaintiffs' claim that being assigned to Building 21 places greater demands on deputies than other housing posts (*see* Section B.1.a., *supra*) and the claim should be denied for the same reasons. In *Carrero*, the plaintiff sought jail assignments that presented "less risk to his safety." 2007 WL 1655350, at *14. However, the court denied there was an adverse action because the "only citation in support of the assertion that one assignment was more dangerous than another reveal[ed] that this contention [was] based only on [the plaintiff's] own subjective and conclusory beliefs as to the safety of the assignment." *Id.* The court further held that such evidence was insufficient to demonstrate that there was a

---

[11] Plaintiffs cite to the report of their expert Susan Jones for the purpose of stating that extended inmate supervision often leads to a form of "burnout" known as "correctional fatigue." Response p. 74. However, this statement is not evidence that the alleged denial of posts with less inmate supervision is an adverse action. Furthermore, this is not an issue that can be addressed by experts as experts cannot apply facts to law. *Richter v. City of Commerce City, Colorado*, 185 F. Supp. 3d 1274, 1280 (D. Colo. 2016) (precluding expert from testifying regarding adverse employment action).

substantial difference between the assignment he sought and the assignment he had. *Id.* Similarly, there is only subjective and conclusory evidence here.[12]

### 3. Plaintiffs Were Not Segregated and/or Denied Posts Because of Their Gender.

Plaintiffs next spend considerable time claiming that they can each show factually that they were segregated into Building 21 and/or they were denied posts with less inmate supervision. Response pp. 76-79.[13]  For purposes of this Reply only, it is not necessary for Defendant to address the post assignments of each individual Plaintiff because, as set forth above, Plaintiffs' post assignments are not an adverse action.

Even if Plaintiffs had been segregated or denied posts they have not shown an inference of discrimination because the evidence is clear that assignments were not based on gender, but were based on the tasks, such as strip-searching, that needed to be accomplished (Ex. T, 67:14-24; 69:24-71:1; 72:3-16; 74:11-21), protection from accusations of sexual assault (Ex. 32 109:15-18) and the experience of the deputies (Ex. V, 13:5-13).  The post that deputies liked or did not like was also taken into consideration.  (Ex. V, 14:19-15:6).

---

[12]  Plaintiffs again improperly rely on the unverified report of their expert, Pacey Economics, for evidence that "main gate is the second most sought after post." Response p.75.  The hearsay report is unreliable because the report assumes that the main gate position was the second most sought after based on how many deputies worked in the post on overtime.  Pacey's conclusions assume that deputies actually made the choice to work that post and the choice was based on liking the post rather than simply being whatever post was available at the time (or for any other reasons).

[13]  Plaintiffs also rely on Pacey's expert report claiming there is a statistically significant disparity in the number of relief posts assigned to female deputies.  Response p. 76.  However, "[e]ven statistics which show prolonged and marked imbalance may not be controlling in an individual discrimination case where a legitimate reason for the employer's action is present." *Bauer v. Bailar*, 647 F.2d 1037, 1045 (10th Cir. 1981).  *See* also *Turner v. Pub. Serv. Co. of Colorado*, 563 F.3d 1136, 1146 (10th Cir. 2009).  Here, the evidence is that post assignments are based on duties that must be conducted, such as strip searching; protection from sexual assault complaints; and the experience of the deputies. Ex. 32 at 109:15-18; Ex. T (attached hereto) at 67:14-24; 69:24-71:1; 72:3-16, 74:11-21; Ex. V (attached hereto) at 13:5-13, 14:19-15:6.

4.    Plaintiffs Failed to Evidence of Pretext.

Once a prima facie case is established, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. See *James v. James*, 129 F.Supp.3d 1212, 1225 (D.Colo. 2015). If the defendant is able to do so, the burden returns to the plaintiff to show that the defendant's proffered reason is pretext for discriminatory animus against her gender. *Id.* To do so, the plaintiff must show that the explanation is "so incoherent, weak, inconsistent or contradictory that a rational factfinder could conclude [it is] unworthy of belief." *Conroy v. Vilsack*, 707 F.3d 1163, 1172 (10th Cir. 2013). Courts may not second guess the business judgment of the employer. *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1307–08 (10th Cir. 2017). "[O]ur role is to prevent intentional discriminatory ... practices, not to act as a 'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments." *Id.,* internal citations omitted.  The determinative question is whether "a reasonable factfinder could rationally find [the employer's rationale] unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons." *Id.*

Here, Defendant has established legitimate, non-discriminatory penological reasons for its decisions (which are not adverse employment actions) regarding post assignments, including the tasks that must be completed such as having only females pat-searching and strip-searching other females in order to comply with federal law (Ex. T, 67:14-24; 69:24-71:1; 72:3-16; 74:11-21), and protecting male deputies  from accusations of sexual assault (Ex. 32 at 109:15-18). There is no evidence that these reasons for Defendant's decisions are incoherent, weak or contradictory, unworthy of credence or a farce enacted to allow Defendant to discriminate against women.  Plaintiff's claims therefore fail under *McDonald-Douglas.*

### C.    MONTANO HAS NOT ESTABLISHED A *PRIMA FACIE* CASE AS TO SPECIAL ASSIGNMENTS

Plaintiff Montano asserts she suffered an adverse action when she applied for, but did not receive, "special assignments," which are assignments outside the housing units.  She suggests special assignments are "preferred" because they avoid the danger, difficulty, and stress that comes from working as a floor deputy and, therefore, the failure to receive a special assignment is an adverse action.  As discussed above, these subjective and conclusory beliefs were rejected by the court in *Carrero*, 2007 WL 1655350, *14.

Plaintiff Montano cites to the testimony of Division Chief Connie Coyle claiming it states that "supervising inmates is inherently dangerous work that imposes particular stresses on correctional officers" leading to burnout.  However, Chief Coyle did not state special assignments are any less dangerous than housing units.  Chief Coyle also made no statement regarding what assignments are preferred.  Chief Coyle said nothing more than supervising inmates imposes particular stresses and demands on correctional officers. Ex. 1 at 28:4-17.

Montano also asserts special assignments are preferred because they provide career enrichment opportunities.  Yet Montano has no evidence of promotions or other employment opportunities that she applied for, but did not receive, because she did not serve in a particular special assignment.  There is also no evidence that special assignments are required for promotion to sergeant or any other position.  Moreover, Plaintiffs' affirmative statement in their Response is that they are not claiming a failure to be promoted.

Plaintiff Montano also contends that special assignments are more desirable because of the work hours.  Response p. 80.  However, being denied subjectively more desirable work hours is not an adverse action.  *See Cook v. McHugh*, No. 14-CV-00058-LTB-CBS, 2015 WL 4100423, at

*9 (D. Colo. May 26, 2015) (court acknowledges that many employees would prefer to work every other Friday and be able to leave early on the alternate Fridays, but this desire does not establish that assignment to a five-day work week is sufficiently material to constitute a significant change in employment status).  Plaintiffs rely on *Wedow v. City of Kansas City, Mo.*, 442 F.3d 661, 675 (8th Cir. 2006), which held that denying firefighters special shift designations was an adverse action.  This case has no precedential value and is not similar to the issue presented here.  In *Wedow*, the court determined the denial of the shift was an adverse action because it deprived the plaintiffs of essential job training and left them feeling less competent in performing their job functions. *Id.*  There are no such allegations in the present case.  Additionally, Montano did not provide any actual evidence that special assignments are desired based on work hours[14] or not having to work overtime or that work hours are anything other than a subjective desire.  Because not being chosen for a "special assignment" is not an adverse action, Plaintiff Montano has not established a prima facie claim of disparate treatment.

Even if the denial of a special assignment was an adverse action, Plaintiff Montano's claim fails because her own deposition testimony proves there is no inference of discrimination.  Montano asserts she was denied special assignments to the mail room and relief officer positions, and those posts were given to "less senior[15] male deput[ies]."  However, Montano testified during

---

[14] Interestingly, Plaintiff Hartzog did not desire day-shift hours typically worked in special assignments. She prefers to work 9:45 p.m. to 6:00 a.m. because of her kids.  Ex. F 13:18-14:20, Ex. 16 40:20-22.

[15]   During her deposition, Ms. Montano did not describe Deputy Garechana, who received one of the relief positions, as a "less senior," deputy.  Instead, she testified, "I know he was a deputy for a long time." Ex. 10 at 61:20. Furthermore, Plaintiff relies on badge numbers to reflect whether a deputy is less senior than she is.  What Montano does not provide is any information regarding whether the deputies that received the positions had experience prior to their employment with Defendant.

her deposition that she was not given the positions because Chief Diggins has something against her "personality wise" (Ex. 10 33:15-22; 41:20-24; 58:12-15; 59:11-19); not because of her gender.

Several of Montano's claims regarding not receiving special assignments are also jurisdictionally barred. An employee who alleges an unlawful employment practice must file her charge within 300 days after the practice occurred. *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113-17 (2002). *See also Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 628 (10th Cir. 2012). A discrete discrimination act occurs on the day it happened. *Id.* Each incident of discrimination constitutes a separate, actionable "unlawful employment practice" for which administrative remedies must be exhausted. *Martinez v. Potter*, 347 F.3d 1208, 1210-11 (10th Cir. 2003). A charge, therefore, must be filed with the 300-day time period after the discrete discriminatory act occurred. *Morgan*, 536 U.S. at 113. Montano filed her EEOC Charge on October 7, 2015. Ex. W, attached hereto. Three hundred days before that date is December 11, 2014. Therefore, any disparate treatment claims occurring prior to December 11, 2014, are jurisdictionally barred. Montano's claims that she applied for positions in March 2014, August 2013, June 2008, August 2010, and September 2011 are all barred.

Montano also asserts that she applied for a position at the training academy in December 2015. Response p. 82. This claim is also jurisdictionally barred because it is not included in her EEOC Charge. Ex. W, attached hereto. This claim is also barred because Montano admitted in her deposition that two female deputies were assigned the academy positions (Ex. G at 26:1-25), defeating any claim of gender discrimination.

For these reasons, Plaintiff Montano's disparate treatment claim regarding special assignments must be dismissed.

**D.** **Plaintiffs' Resignations and Retirements Cannot Be Recharacterized as constructive Discharges.**

    1.    No Issue of Fact Precludes Summary Judgment on Ms. Rasmussen's Claim of Constructive Discharge.

Plaintiffs fail to meet their "substantial" burden of demonstrating that Ms. Rasmussen's resignation, which she herself announced to the Department as a "voluntary separation" (*see* Ex. M, p. 14), was actually the only path available to her. *See Furr v. Ridgewood Surgery & Endoscopy Ctr., LLC*, 192 F.Supp.3d 1230, 1247 (D.Kan. 2016). Plaintiffs do not dispute the facts contained in the City's Motion in support of the voluntary nature of Ms. Rasmussen's resignation, including the gender-neutral reasons she has testified to for her resignation, her waiting several months to find a job before resigning, or her failure to attempt to resolve – or even bring up – any alleged workplace issues making her workplace purportedly intolerable. Instead, Plaintiffs focus only on the alleged hostile work environment in the Department, without addressing Ms. Rasmussen's decision to quit, and without analyzing the factors pertinent to determining whether a separation was voluntary. As a result, this claim does not survive summary judgment.

Significantly, Plaintiffs cannot overcome the facts that Ms. Rasmussen characterized her resignation as "voluntary," she spent three to four months securing a job with the Arvada Police Department before announcing her decision to resign, and explained her decision to resign as based on her frustration with the manner in which the Department handled media scrutiny, her dissatisfaction with 16-hour workdays, and her disagreement with how the Department handled inmates arrested in her zip code who threatened to physically harm her. (*See* Ex. M, p. 14; Ex. M at 109:15-22, 110:1-9, 111:15-25, 112:1, 112:20-25, 113:1-15, 114:11-18, 212:2-4). Nor do Plaintiffs dispute that Ms. Rasmussen did not try to resolve any of the foregoing issues with the

Department prior to resigning (*see id.* at 119:17-21).  All of these conceded points underscore the voluntary nature of Ms. Rasmussen's planned departure.  *See Land v. Midwest Office Tech., Inc.*, 114 F.Supp.2d 1121, 1146 (D.Kan. 2000) (no constructive discharge where plaintiff sought jobs with other employers before she resigned); *Walker v. United Parcel Serv. of Am.*, 76 Fed.Appx. 881, *8 (10th Cir. Sept. 11, 2003) (entering summary judgment in favor of UPS on constructive discharge claim where the employee did not point to any evidence that she complained to anyone at UPS about her allegedly intolerable work conditions, procured another job at Federal Express before announcing her resignation, and then gave two-weeks' notice).  In light of these conceded points, summary judgment must issue in favor of the City on Ms. Rasmussen's allegation of constructive discharge.

    2.    No Issue of Fact Precludes Summary Judgment on Ms. Purdy's Claim of Constructive Discharge.

Ms. Purdy's belated efforts to couch her retirement as a constructive discharge also fails. Plaintiffs do not dispute that Ms. Purdy's December 7, 2015 "Letter of intent to retire" does not mention any alleged sexual harassment, and it lists her anticipated date of retirement three weeks later, on December 31, 2015.  (*See* Ex. J, p. 15).

Although Plaintiffs argue that "[i]t was not necessary for her to skip out on a shift, or otherwise quit in some dramatic fashion, to show the Department had made her job intolerable" (Response at 89), this overlooks the fact that plaintiffs waiting weeks after announcing their separation from employment cannot later assert a claim of constructive discharge.  *See Shelar v. Ameripride Servs., Inc.*, 2006 WL 1877010, *9 (D.Kan. July 6, 2006) ("Giving several weeks notice of the date on which one will be compelled to resign is unprecedented, in this court's experience, for a successful constructive discharge claim."); *Skare v. Extendicare Health Servs.,*

*Inc.*, 431 F.Supp.2d 969, 976 (D.Minn. 2006) (plaintiff who set her effective resignation date one month out could not demonstrate constructive discharge); *Johnson v. Wal-Mart Stores, Inc.*, 987 F.Supp. 1376, 1394 (M.D.Ala. 1997) ("That Johnson was able to ... give Wal–Mart three weeks notice before leaving her position strongly suggests that the conditions to which she allegedly [was] subjected were not intolerable."). Plaintiffs' focus on Ms. Purdy's alleged "emotional issues" caused by "ha[ving] to work for the Department" (Response at 89) is also irrelevant to this analysis. *See Land*, 114 F.Supp.2d at 1146 (employee's subjective view of employment environment is not relevant in analyzing claim of constructive discharge). As a result, no issue of fact precludes the entry of summary judgment on the constructive discharge allegations of Ms. Purdy.

> 3.   No Issue of Fact Precludes Summary Judgment on Ms. Mickelson's Claim of Constructive Discharge.

Ms. Mickelson attempts to create an issue of fact regarding her voluntary resignation through focusing on the allegedly hostile nature of the work environment, including purported harassment from a supervisor that is not at issue in this lawsuit. (*See* Response at 87).[16] But she does not address the undisputed facts demonstrating the voluntariness of her resignation. Namely, that: (1) Ms. Mickelson waited to secure a position with Winter Park before she left the Denver Sheriff's Department, and told multiple deputies that she was leaving the Department to become a

---

[16] Ms. Mickelson's reliance on an incident in which an inmate grabbed her buttocks (*see* Response at 86) is also unavailing. Ms. Mickelson does not dispute that four officers responded, her sergeant agreed she should go home the remainder of that day, another sergeant contacted the Denver Police Department, and an investigation was conducted, resulting in the inmate being charged with four violations. Although Ms. Mickelson states that "no sufficient punishment was imposed" on the inmate, she does acknowledge that the inmate was found guilty after his CAB hearing, and received a sentence of (Ms. Mickelson believes) 60 days in corrective custody, suspended down to ten days. (*See* Mickelson Depo. at 85:1-19, attached as Ex. X). Ms. Mickelson's subjective dissatisfaction with the penalties imposed on the inmate is an insufficient basis to find constructive discharge. *See Furr*, 192 F.Supp.3d at 1246-47 (noting that in the constructive discharge analysis, the employee's subjective views are irrelevant).

ski instructor (*see* Ex. L at 128:23-25, 129:18-25, 130:1); (2) she continued to work for five months after the culminating event allegedly forcing her to resign – denial of a firearms position based on an open IAB investigation on her (*see id.* at 108:11-20); (3) she chose January 7, 2015 as her resignation date because she wanted to finish out the year and the holidays (*see id.* at 113:6-12). These undisputed facts belie any alleged forced resignation.  *See Harper v. Ulta Salon Cosmetics & Fragrance, Inc.*, 2007 WL 528088, *28 (N.D.Ga. Feb. 13, 2007) (noting that plaintiff's "claim that her conditions were intolerable is belied by the fact that she waited to resign until after she found another job.  If the conditions were truly intolerable, [plaintiff] would have resigned immediately even without the prospect of another job.").

To the extent Plaintiffs argue that Ms. Mickelson attempted to alleviate her concerns through a letter to the Department "about the sexual harassment and instances where deputies were treated unfairly" (Response at 86), a review of this letter reveals that it contains absolutely no reference whatsoever to sexual harassment.  (*See* Ex. L, pp. 22-24).  For all these reasons, Ms. Mickelson's claim of constructive discharge fails.  *See White v. Midwest Office Tech., Inc.*, 5 F.Supp.2d 936, 950 (D.Kan. 1998) (no constructive discharge where plaintiff's letter indicated problems with feeling suppressesd and unwelcome, but did not mention sexual harassment).

4.    No Issue of Fact Precludes Summary Judgment on Ms. Eddy's Claim of Constructive  Discharge.

Plaintiffs do not dispute that Plaintiff chose her retirement six years after she first became retirement-eligible, and stayed with the Department an additional four months after she allegedly determined she had had "all I could handle."  (*See* Ex. R at 187:7-23, 188:13-20).  Nor do Plaintiffs dispute that Ms. Eddy did not attempt to solve her workplace issues through internal procedures, such as contacting HR or indicating that she would be retiring because of the environment, which

undermines her claim of constructive discharge. *See Tobar v. Arkansas Dep't of Corr.*, 2009 WL 1286298, *3 (E.D.Ark. May 7, 2009) (no constructive discharge where employee did not file any formal complaints or grievances with her employer regarding her alleged harassment).

Plaintiffs argue in favor of constructive discharge on the grounds that Ms. Eddy's supervisor instructed her to give misbehaving male inmates constructive work assignments, that a female captain told staff members to give any inmates misbehaving (not necessarily tied to sexual harassment) constructive work assignments, and that an inmate she had written up was not moved out of her pod as quickly as she would have liked. But Ms. Eddy's subjective dissatisfaction with the corrective penalties imposed on inmates, and her personal belief that a constructive work assignment is not discipline, are irrelevant in determining whether the workplace was so intolerable that she had no choice but to quit. *See Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847, 858 (10th Cir. 2000) ("given the objective standard, an employee's subjective feelings or beliefs are not relevant in a constructive discharge claim). Where, as here, an employee resigns "of her own free will, even as a result of the employer's actions, that employee will not be held to have been constructively discharged." *Id.*

5.   No Issue of Fact Precludes Summary Judgment on Ms. Major's Claim of Constructive Discharge.

It is undisputed that on June 24, 2015, Ms. Major submitted her retirement letter, in which she stated "I regret to inform you that I am retiring due to medical reasons." (Ex. I, p 10; Ex. I at 36:4-11). It is also undisputed that Ms. Major chose her 25-year anniversary with the City as her retirement date. (*See* Ex. I at 32:24-25, 33:1, 42:12-25, 43:1). These facts are fatal to her present claim of constructive discharge. *See Knowles v. Citicorp Mortgage, Inc.*, 142 F.3d 1082, 1086 (8th Cir. 1998) (rejecting constructive discharge claim based, in apart, on the fact that the plaintiff

submitted a letter of resignation that did not raise any of his allegedly true reasons for leaving); *Katz v. Beth Israel Med. Ctr.*, 2001 WL 11064, \*12 (Jan. 4, 2001) (no constructive discharge where plaintiff's retirement letter did not allege discrimination, but rather stated that she was retiring due to a disability; "a resignation letter lacking any mention of intolerable conditions, or even mistreatment, undermines a later claim of constructive discharge.").

In an attempt to evade these inconvenient facts, Plaintiffs focus on Ms. Major's testimony regarding inmate sexual misconduct, and state that her decision to retire on her 25th anniversary was based on "years of witnessing exhibitionistic masturbation and having lewd and crude comments hurled at her." (Response at 92-93). Yet none of Ms. Major's testimony to this effect was made in conjunction with her decision to retire. Plaintiffs cannot tie unrelated comments made during Ms. Major's deposition to the ultimate issue of whether her separation from work was coerced or voluntary. Because Plaintiffs have proffered no evidence demonstrating that Ms. Major had no choice but to resign on her 25th anniversary, Ms. Major's claim of constructive discharge should be summarily adjudicated in favor of the City.

## V.   CONCLUSION

That Plaintiffs take issue with the level and type of discipline imposed against male inmates who have allegedly harassed them, and that Plaintiffs may disagree with the staffing decisions implemented by DSD supervisors to ensure the facilities run efficiently and in accordance with the PREA, does not render Plaintiffs' claims actionable under Title VII. Plaintiffs' Summary Judgment Response failed to identify any actions undertaken by the City motivated by anti-female discriminatory animus. For all the reasons set forth in this Motion and this Reply, the City respectfully moves the Court to: (1) enter summary judgment in its favor on the hostile work

environment claims alleged by Plaintiffs Samone Walker, DaShawn Walker, Hartzog, Montano, and Casados; and (2) enter summary judgment in its favor on all of the disparate treatment claims alleged by Plaintiffs in this action.

Respectfully submitted this 9th day of November, 2017.

JESSICA ALLEN
SHELBY A. FELTON
NATALIA S. BALLINGER
Assistant City Attorneys

*s/ Jessica Allen*
Denver City Attorney's Office
201 W. Colfax Avenue, Dept. 1108
Denver, Colorado 80202
(720) 913-3100
E-mail:  jessica.allen@denvergov.org
E-mail:  natalia.ballinger@denvergov.org
E-mail: shelby.felton@denvergov.org
E-mail: dlefiling.litigation@denvergov.org
*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on November 9, 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Wilbur C. Smith, Esq.
WILBUR C. SMITH P.C.
wil@civilcriminal.com

Brian T. Moore, Esq.
Niki Schwab, Esq.
JESTER GIBSON & MOORE, LLP
BMoore@jgllp.com

nschwab@jgllp.com

*s/ Jessica Allen*
Denver City Attorney's Office