**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger**

Civil Action No. 15-cv-02539-MSK-STV

TERRI EDDY,
REBECCA ESQUIBEL,
DENITA HARTZOG,
GIOVANNA KEMP,
LISA MAES,
PEGGY MAJOR,
COURTNEY MICKELSON,
SADIE MONTANO,
PAULA PURDY,
STACI WRIGHT,
SAMONE WALKER,
DASHAWN WALKER,
THERESA DENBOW,
CESQUA RASMUSSEN, and
RHONDA CASADOS,

      Plaintiffs,

v.

CITY AND COUNTY OF DENVER, DENVER SHERIFF'S DEPARTMENT, a Municipal corporation,

      Defendant.

_____

**OPINION AND ORDER RE: DEFENDANT'S MOTION FOR PARTIAL SUMMARY
JUDGMENT**
_____

      **THIS MATTER** comes before the Court pursuant to a Motion for Partial Summary

Judgment (the "Motion") filed by Defendant City and County of Denver, Denver Sheriff's

Department (the "Sheriff's Department") (**#93**). The Court has also reviewed and considered

Plaintiffs' Response (**#98**), the Sheriff's Department's Reply (**#108**), and supplemental exhibits

submitted by Plaintiffs (**#109** and **#110**).

## I.    Jurisdiction

Plaintiffs (collectively, the "Deputies") bring two claims under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*  They contend that the Sheriff's Department violated Title VII in two ways.  First, the Sheriff's Department exposed them to a hostile work environment that included pervasive sexual harassment by inmates, at two Denver jail facilities, and failed to take reasonable steps to mitigate or prevent the harassment.  Second, the Sheriff's Department unlawfully assigned the Deputies to inferior and objectionable posts because they were women.

The Court exercises federal question jurisdiction with regard to these claims pursuant to 28 U.S.C. § 1331.

## II.    Relevant Facts

The following facts are undisputed or where disputed are viewed in the light most favorable to the nonmovants, the Deputies.  More factual details are provided as necessary in the Court's discussion.

The Deputies are current or former deputy sheriffs who are employed by Denver, and who have worked as corrections officers in the Denver County Jail (the "Jail") or the Denver Downtown Detention Center (the "Center").  At the Jail and the Center, inmates[1] are segregated by sex and housed in "pods."  Pods are structured in a variety of ways - open barracks, individual cells or shared cells.

Male inmates are housed at both the Jail and the Center, assigned to different pods based on how dangerous they are perceived to be or the severity of their charges/offense.  Typically, more dangerous inmates and/or inmates charged with more serious crimes are kept in closed

---

[1] Technically, persons detained prior to conviction are "detainees", while those serving sentences after conviction are "inmates".  For ease of reference, however,  this decision will refer to all residents at the facilities as inmates.

pods separate from less dangerous inmates.  Similarly, male inmates with significant mental health disorders typically are removed from the general population units and housed separately.

Most female inmates are housed in Building 21 at the Jail, although a handful are in smaller pods or units at the Center.  They are not segregated based on perceptions of how dangerous they are, their charges/offenses, or their mental health status.  The housing units in Building 21 are "open" without individual or shared cells.  The workload for deputies working in Building 21 is heavier and more stressful than for deputies working in other buildings.  This is caused by low staffing levels, lack of segregation of inmates based on danger level, serious of charges/offense or mental health status, and the inability to manage inmates by using individual or shared cells.  In addition, Building 21 operates more like a "jail within a jail," with deputies being required more varied tasks than deputies who work in other buildings.

Deputies are assigned to two broad categories of posts – general inmate supervision posts and special assignment posts.  In general inmate supervision posts, deputies continuously monitor and/or supervise inmates in a specified housing unit or building.  In contrast, special assignment posts are those that are outside of the housing units, such as in the mail room, training academy, kitchen, *etc.*  Special assignment posts generally – although not always – involve less inmate supervision responsibilities and less stress than do general inmate supervision posts, and consequently they tend to be more popular among deputies.

According to Sheriff's Department policy, deputies are to be assigned to buildings and units within the Jail and the Center without regard to sex.  However, the performance of certain tasks is limited by sex. Female deputies are not permitted to conduct strip searches of male inmates, and male deputies are not permitted to conduct pat down or strip searches of female inmates.  Except for the special assignment Intake post, where strip searches necessarily occur,

deputies are eligible to work any post regardless of his/her sex. Within posts, however, there are requirements that a certain number of on-duty deputies be male or female, in order to accommodate strip searches and pat down searches. For example, in Building 21 where the inmate population is all female, there must be at least two female deputies on duty.

A.    *Sexual Harassment of the Deputies by Inmates*

The Deputies experience pervasive sexual harassment by male inmates housed in male units at the Jail and in the Center. Inmates routinely make lewd and sexualized remarks to the Deputies, expose their genitals to the Deputies, and masturbate in front of the Deputies with the purposeful intention of offending or embarrassing them.[2] The record also contains description of on one incident where a female Deputy was grabbed by an inmate in a sexual manner. Individual Plaintiffs describe different frequencies to these events, but many state that they occur on a weekly or more frequent basis, and some Deputies describe the conduct as having gotten worse over a period years.

Such inmate behavior violates the Sheriff's Department policy and can result in inmate disciplinary action. A deputy who witnesses a violation can document and report the inmate's behavior by filling out an Offense-in-Custody ("OIC") form. A violation can result in a reprimand, loss of privileges, corrective confinement, or loss of good time credit. Indecent exposure and public masturbation, which is treated as a variant of indecent exposure, are classified as Class 4 offenses for first time offenders (potentially punishable by separation from the jail population and a loss of privileges of three to ten days), and Class 3 offenses for repeat

---

[2]     The record also contains description of on one incident where a female Deputy was grabbed by an inmate in a sexual manner. Deputy Mickelson further has produced evidence that upon reporting the assault to her superiors, she was told that it was only a minor incident because she was not actually raped. In a similar vein, several of these former Deputies have come forward with evidence that they were threatened with rape and other sexual violence repeatedly while supervising male inmates.

offenders (potentially punishable by separation and a loss of privileges of five to twenty days). As an alternative to "write-up" using the OIC form, deputies can impose the informal punishment of a constructive work assignment involving tedious or unpleasant chores or tasks (sweeping, mopping, cleaning trash cans, *etc.*).

The Deputies have reported the sexually harassing behavior of inmates, and the failure of discipline to their superiors. Some were informally told by supervisors that tolerating sexually harassing behaviors by inmates – including offensive comments, indecent exposure and public masturbation – was "part of the job," and they should accept that sort of environment if they wanted to stay in corrections. Tolerance of, or indifference to, sexually harassing behaviors by inmates has also been was stressed in new deputy training.

Approximately 750 OIC forms have been submitted in recent years, including forms documenting and reporting approximately 100 instances of exhibitionist masturbation. But the disciplinary process has not been vigorously pursued. On some occasions only modest sanctions were imposed or the sanction was suspended. Some Deputies were informally discouraged from reporting violations through the OIC process, and instead, they were encouraged to discipline sexually harassing behaviors through the use of constructive work assignments. This alternative proves ineffective in punishing and deterring future conduct, however, because (1) some inmates enjoy constructive work assignments that allow them to leave their cells, and (2) enforcement requires the deputy who was the target of the sexually harassing behavior to supervise the inmate responsible for it, which leads to more or the same behavior. Additional evidence produced by the Deputies suggests that

Despite repeated complaints to supervising corrections officers, (1) the Sheriff's Department has not promulgated or implemented any policies specifically intended to address

and prevent sexual harassment of female deputies by the inmates, including (without limitation) exhibitionist masturbation; (2) the Sheriff's Department has not trained deputies or supervisory staff on how to report and discipline sexually harassing behavior by inmates; (3) supervisors at the Sheriff's Department pressured the Deputies to report sexually harassing behavior by inmates as "information only" violations, thus avoiding the disciplinary process altogether, and (4) the Sheriff's Department does not effectively enforce its prohibitions on sexually harassing conduct current on the books by seriously adjudicating reports of such conduct and assessing appropriate discipline where inmates are found to have engaged in it.

B.      *Disparate Assignment of the Deputies because they are female*

Some of Deputies claim that they were assigned to Building 21 simply because they were female.  Prior to 2015 or 2016, deputy supervisors at the Sheriff's Department preferred to assign only female deputies to Building 21 posts. This was done to protect male deputies from being accused of sexual assault or other crimes by the female inmates housed there.   Some of the supervisors also preferred to staff only male deputies in all-male units due the prevalence of fights between male inmates.  If female deputies were assigned to non-housing posts that did not involve supervision of inmates, they frequently were pulled off of such posts and sent to Building 21 to increase female staffing.

As noted, being staffed at Building 21 posts was significantly more stressful and difficult than most other assignments, and that continuous staffing at such posts caused significant mental anguish and burnout.  Building 21 experienced chronic understaffing plus it lacked specificity in task assignment to deputies so each deputy was required to perform virtually all required tasks (intake, kitchen duty, transportation, *etc.*), that would be performed by specialized units in the

rest of the Jail and the Center. The evidence of the undesirability of Building 21 posts is found in testimonial evidence from the Deputies and expert opinion[3].

Similarly, the Deputies have produced evidence that many of them sought special assignment posts in the Jail and Center generally, which (as discussed above) normally are non-housing positions involving significantly less stress and difficulty than housing posts. Other Deputies have produced testimonial evidence that they were excluded from more favorable special assignment posts in favor of male deputies. These Deputies have come forward with evidence that they applied for special assignment positions several times over the years and were turned down in favor of less experienced and more junior male deputies. There is at least some testimonial evidence that the rejected Deputies have never received explanation for why they were repeatedly passed over for special assignments.

## III.    Standard of Review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Thus, the primary question presented to the Court in considering a motion for summary judgment: is a trial required?

A trial is required if there are material factual disputes to resolve. As a result, entry of summary judgment is authorized only "when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016). A fact is material if, under the substantive

---

[3]    The Sheriff's Department objected to the evidence involving the Deputies' expert witnesses – their expert reports – on the grounds that they are not accompanied by affidavits or other verifications attesting that the reports contain opinions from those experts about which they anticipated testifying at trial. The deficiency was corrected by supplementation to their Response. (**#109**)

law, it is an essential element of the claim. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if the conflicting evidence would enable a rational trier of fact to resolve the dispute for either party. *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013).

The consideration of a summary judgment motion requires the Court to focus on the asserted claims and defenses, their legal elements, and which party has the burden of proof. Substantive law specifies the elements that must be proven for a given claim or defense, sets the standard of proof, and identifies the party with the burden of proof. *See Anderson*, 477 U.S. at 248; *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). As to the evidence offered during summary judgment, the Court views it the light most favorable to the non-moving party, thereby favoring the right to trial. *See Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013).

Motions for summary judgment generally arise in one of two contexts – when the movant has the burden of proof and when the non-movant has the burden of proof. Each context is handled differently. When the movant has the burden of proof, the movant must come forward with sufficient, competent evidence to establish each element of its claim or defense. *See* Fed. R. Civ. P. 56(c)(1)(A). Presumably, in the absence of contrary evidence, this showing would entitle the movant to judgment as a matter of law. However, if the responding party presents contrary evidence to establish a genuine dispute as to any material fact, a trial is required and the motion must be denied. *See Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015); *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013).

A different circumstance arises when the movant does not have the burden of proof. In this circumstance, the movant contends that the non-movant lacks sufficient evidence to establish a *prima facie* case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The moving party must

identify why the respondent cannot make a *prima facie* showing; that is, why the evidence in the record shows that the respondent cannot establish a particular element. *See Collins*, 809 F.3d at 1137. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, then a trial is required. Conversely, if the respondent's evidence is inadequate to establish a *prima facie* claim or defense, then no factual determination of that claim or defense is required and summary judgment may enter. *See Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007).

### IV.    Analysis

The Sheriff's Department moves for summary judgment on the hostile work environment claim brought by Deputies Dashawn Walker, Samone Walker, Hartzog, Montano and Casados, and on the disparate-treatment claim in its entirety. With respect to each, the Sheriff's Department argues that the Deputies have failed to come forward with sufficient evidence to make a *prima facie* of a cognizable claim.

### A.    Hostile Work Environment Claim by Deputies Dashawn Walker, Samone Walker, Hartzog, Montano and Casados

As explained above, the Deputies generally contend that they each were exposed to widespread sexually harassing behavior by male inmates, including lewd and offensive remarks, indecent exposure, and public masturbation. The Deputies further contend that the Sheriff's Department did not take sufficient steps to prevent or mitigate this conduct by the male inmates. For a majority of the Deputies, the Sheriff's Department has not moved for summary judgment on their hostile work environment claims, apparently conceding that there are questions of disputed material fact with respect to those particular Deputies. However, for each of these five Deputies, the Sheriff's Department contends that she has not and cannot come forward with

evidence sufficient to establish a *prima facie* claim against the Sheriff's Department for the third-party conduct of inmates.

1.     *Sex Discrimination and Hostile Work Environment – the legal standards*

Title VII prohibits discrimination based on sex. One form of sex discrimination is subjecting an employee to sexual harassment a sexually hostile or abusive work environment. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66-67 (1986); *Nieto v. Kapoor*, 268 F.3d 1208, 1217-18 (10th Cir. 2001). To establish a claim for hostile work environment, each Deputy must present evidence to show that (i) she is a member of a protected group; (ii) she was subject to unwelcome harassment, intimidation, or ridicule; (iii) the such harassment was based on her protected status; (iv) that the harassment was severe and pervasive, in both an objective and subjective sense, and (v) the harassment had the effect of altering a term, condition, or privilege of her employment and created an abusive working environment. *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1222 (10th Cir. 2015). As to these five Deputies, the Sheriff's Department argues that there is insufficient evidence to establish the fourth of those elements – that the harassment was severe and pervasive.

Title VII is not a "general civility code" and a plaintiff may not predicate a hostile work environment claim on the "run-of-the-mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces." *Id.*; *accord Morris v. City of Colo. Springs*, 666 F.3d 654, 663-64 (10th Cir. 2012). Instead, "[a]n employer creates a hostile work environment when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Hall v. U.S. Dep't of Labor*, 476 F.3d 847, 851 (10th Cir. 2007) (internal quotations omitted). Isolated or sporadic sex-based incidents of harassment will not be sufficient

to establish a hostile work environment clam.  *Morris*, 666 F.3d at 666; *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1365 (10th Cir. 1997).

Moreover, it is important to recognize that the severity and pervasiveness evaluation is inherently fact-dependent; there is not, and cannot, be a precise test for the determination. Instead, the determination is made by looking at the totality of the circumstances.  *See Lounds*, 812 F.3d at 1222.  "[T]he word 'pervasive' is not a counting measure.  The trier of fact utilizes a broader contextual analysis" that carefully considers each instance as a component of the overall working environment.  *Smith v. Nw. Fin. Acceptance, Inc.*, 129 F.3d 1408, 1415 (10th Cir. 1997); *accord Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1143 (10th Cir. 2008).  Courts consider a variety of factors, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance.  *Smith*, 129 F.3d at 1415; *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1098 (10th Cir. 1999).

Furthermore, a court considering a hostile work environment claim must assess whether the work environment is both subjectively *and* objectively hostile or abusive.  *MacKenzie v. City & Cty. of Denver*, 414 F.3d 1266, 1280 (10th Cir. 2005). It is *necessary* for the plaintiff to subjectively view the work environment to be abusive.  *Morris*, 666 F.3d at 664-65.  In addition, the environment must be deems hostile by a reasonable employee working in the same or similar circumstances.  *See, e.g.*, *Lounds*, 812 F.3d at 1222-23; *Smith*, 129 F.3d at 1413.

Finally, and notably in this case, incidents of sexual harassment directed at individuals other than the plaintiff bringing the particular claim are relevant.  The evidence of a general work atmosphere can be an important factor in evaluating a hostile work environment claim.  *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1415-16 (10th Cir. 1987); *accord Hirase-Doi v. U.S. West*

*Commc'ns, Inc.*, 61 F.3d 777, 782 (10th Cir. 1995), *abrogated on other grounds by* 524 U.S. 742 *and* 524 U.S. 775. But for sexual harassment targeting other employees to be considered to be the "general work atmosphere," a plaintiff must be aware of the offending behavior directed at others. *Tademy*, 614 F.3d at 1146; *Hirase-Doi*, 61 F.3d at 782.

An employer may be held liable for the sexual harassing conduct of nonemployees if the employer "fail[ed] to remedy or prevent a hostile or offensive work environment of which management-level employees knew, or in the exercise of reasonable care should have known." *Lockard v. Pizza Hut*, 162 F.3d 1062, 1072-74 (10th Cir. 1998). This essentially amounts to a negligence analysis. *Turnbull v. Topeka State Hosp.*, 255 F.3d 1238, 1244 (10th Cir. 2001). That negligence analysis then can be divided into two separate inquiries, looking "first, into the employer's actual or constructive knowledge of harassment, and second, into the adequacy of the employer's remedial and preventative responses." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 673 (10th Cir. 1998).

Actual knowledge of harassment occurs when the plaintiff has reported harassment to management-level employees. *Harsco Corp. v. Renner*, 475 F.3d 1179, 1188 (10th Cir. 2007). Constructive knowledge occurs when "the incidents of harassment were so egregious, numerous, and concentrated as to add up to a campaign of harassment that the employer will be culpable for failure to discover what is going on." *Debord v. Mercy Health Sys. of Kan., Inc.*, 737 F.3d 642, 652 (10th Cir. 2013). Essentially, constructive knowledge will be imputed to an employer when the harassing conduct is so egregious and widespread that management either is aware of it or is incompetent for not discovering it. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 675 (10th Cir. 1998).

3.    *Application the evidence produced by each challenged deputy*

The Court question of whether there is evidence to show that each of the five Deputies have been subjected to a hostile work environment will be addressed on an individual basis. However, the question of whether there is evidence to show that the Sheriff's Department has adequate actual or constructive knowledge that its female deputies are/were being subjected to sexual harassment  by male inmates  will be addressed as to the Deputies as a group.

a.      <u>Deputy Casados</u>

The Sheriff's Department submits that Deputy Casados has only come forward with evidence of three instances of being subjected to masturbation by inmates, and three instances of derogatory name calling over a period of 12 years, and that such exposure is insufficient to be considered "pervasive".

Deputy Casados responds by pointing to her deposition testimony that:

- she experienced sexual harassment "a couple of times a week," mostly consisting of derogatory name-calling;

- the name-calling primarily includes being called gender-specific insults like "cunt," "slut" and "whore";

- she was exposed to public masturbation by inmates more than twenty times between 2005 and 2016;

- the last exposure to an inmate masturbating was in early 2016, when she was making her rounds, and an inmate repeatedly masturbated and refused to stop when instructed;

- in early 2016, she was exposed to aggressive inmates calling her derogatory names and making her feel threatened, to the point where she attempted to have these

inmates removed from her assigned pod, filled out an OIC form, and ultimately

transferred to a position supervising only female inmates;

- she only submitted three OIC forms complaining of harassing behavior by inmates

  because it was not her practice to regularly submit such forms, based on instructions

  given to her by supervisor and conversations with other female deputies; and

- when she first began as a deputy, she was told by her supervising sergeant (Sergeant

  Murphy) upon being exposed to a masturbating inmate that sexual harassment – and

  even egregious forms of sexual harassment – is "part of the job" and she would just

  have to tolerate it.

Taken as true, as Deputy Casados' testimony must be at this juncture, this is sufficient

evidence to establish the fourth element of Deputy Casados' *prima facie* case – pervasive sexual

harassment. Even a single incident of sexually harassing that is "extremely serious" can be

sufficient to show a hostile work environment for the purposes of the Title VII analysis.

*Turnbull*, 255 F.3d at 1242; *Lockard*, 162 F.3d at 1072.  The fact that Deputy Casados could only

recall three specific instances and only submitted three OIC forms complaining of the practice

may be pertinent to her credibility at trial, but that is not assessed in conjunction with this

motion.  *See, e.g., Torres v. Pisano*, 116 F.3d 625, 630-31 (2d Cir. 1997); *Woods v. Champion

Chevrolet*, 35 Fed. App'x 453, 458 (9th Cir. 2002).

The Sheriff's Department reliance on, *Sprague v. Thorn America, Inc.*, 129 F.3d 1355

(10th Cir. 1997), for the proposition that isolated instances of harassing conduct are insufficient

to support a hostile-work-environment claim is misplaced because it is factually distinguishable.

*Sprague* involved "only" five incidents of harassing behavior over a sixteenth-month period;

however, most of those incidents consisted of relatively minor "unpleasant and boorish"

comments made by a supervisor to one of his subordinates. *Id.* at 1366. The most serious of these incidents – the supervisor getting caught looking down the plaintiff's dress and remarking "you got to get it when you can" – occurred at a wedding outside of the workplace. *Id.* The conduct in Sprague was more ambiguous and differentiated than the conduct here. Moreover, Deputy Casados description of the conduct that she experienced is repeated by the testimony by many other Deputies., and was told by her supervisor that tolerating exhibitionist masturbation by inmates is "part of the job."

b.    <u>Deputy DaShawn Walker</u>

The Sheriff's Department argues that Deputy DaShawn Walker also has not shown that she was exposed to pervasive and severe sexually harassing conduct. The Sheriff's Department specifically points to deposition testimony from Deputy DaShawn Walker that she was not exposed to any incidents of public masturbation by inmates in 2016 (and very little sexually harassing conduct in general), she was only exposed to two such instances in 2015, and she could not identify any specific instances in 2014.

In response, Deputy DaShawn Walker directs the Court to her deposition testimony that:

- she was reassigned to Building 21 (the female-only building) in 2016, and she only is exposed to male inmates when she works overtime, which explains why she has not experienced much sexual harassment since then;

- prior to 2016, during her fifteen years working at the Sheriff's Department, she was regularly subjected to sexually harassing conduct in the form of lewd and offensive comments and gestures by inmates, including comments that she perceived as sexually threats;

- she observed this sort of behavior directed at her and at other female deputies;

15

- although she encountered the lewd and offensive (and sometimes threatening) comments more frequently than public masturbation, the latter sort of conduct did occur, including twice in 2015 and an unspecified number of times in 2014;

- she was aware of "a lot" of female deputies complaining about the behavior, to no avail; and

- she and at least twenty other female deputies discussed the widespread sexually harassing conduct they were experiencing from inmates.

This testimony, taken as true, is sufficient to establish severe and pervasive harassment. She has been exposed to constant lewd and offensive comments from inmates for more than a decade, as well as less frequent exposure to public masturbation.[4]  She further has produced evidence showing that she was well aware of the hostile work atmosphere at the Jail and the Center, and the fact that her female colleagues were exposed to widespread sexually harassing conduct.

c.    Deputy Samone Walker

The Sheriff's Department argues that Deputy Samone Walker has not come forward with sufficient evidence that she was exposed to pervasive and severe sexually harassing conduct. The Sheriff's Department specifically notes that at her deposition Deputy Samone Walker was unable to quantify the frequency with which she was exposed to public masturbation prior to 2015 (when she went on light duty and no longer was responsible for supervising male inmates), and she similarly was unable to recall any specific incident of such conduct.  The Sheriff's

---

[4]    The Court again notes that it at least is possible that being exposed to exhibitionist masturbation by an inmate is sufficiently egregious that even a small number of incidents will be sufficient to constitute a hostile work environment.  *See Turnbull*, 255 F.3d at 1242; *Lockard*, 162 F.3d at 1072.

Department also points out that Deputy Samone Walker did not file any OIC forms or other complaints about being exposed to inmate harassment during the time period in question.

In response, Deputy Samone Walker directs the Court to her deposition testimony:

- male inmates regularly made lewd or offensive remarks or gestures directed at her;

- she could not recall any specific lewd of offensive remarks or gestures but it was a "regular thing";

- she could not estimate the frequency with which she would be exposed to an inmate masturbating, "it happens a lot";

- knew that inmates would intend for her to see them masturbating because they would always look at her through their cell door window when doing so; and

- inmates frequently would wait until she was making her rounds and then go to the bathroom in a manner that ensured that she would see them.

This showing is also sufficient for purposes of establishing pervasive and severe sexual harassment. The generality of her testimony goes to her credibility not its sufficiency if taken as true, which it must be at this juncture. Furthermore, it is consistent with the evidence presented by multiple Deputies involving dozens of specific incidents (or more) of inmate masturbation and pervasive lewd and offensive remarks and gestures.

d.     <u>Deputy Hartzog</u>

The Sheriff's Department also contends that Deputy Hartzog has not come forward with enough evidence of specific instances of inmate harassment to defeat summary judgment.

In response, Deputy Hartzog comes forward with the following evidence:

- Deputy Hartzog testified at her deposition that inmates frequently masturbate in their cells with the intention that she witness their behavior;

- She testified that this sort of incident occurred three times in the week before her deposition alone;

- She testified that inmates also go to the bathroom while she is making her rounds with the intent that she witness them; and

- She testified that she believes the inmates specifically are engaging in this sort of behavior for exhibitionist reasons.

For the same reasons explained above, this testimony is sufficient at this juncture to establish pervasive and severe sexual harassment. However, the Sheriff's Department offers a second argument with regard to this showing. It cites testimony from Deputy Hartzog that she did not *personally* feel harassed by the three incidents of exposure to inmates masturbating in the week before her deposition. The Sheriff's Department does not say so in as many words, but it essentially contends that because Deputy Hartzog was not upset or offended, that the conduct was not harassing. In other words, Deputy Hartzog did not *subjectively* experience a hostile work environment.

In response, Deputy Hartzog attempts to distinguish between "sexual harassment" as a legal term used in the Title VII context, and "harassment" as a technical term used to describe certain prohibited inmate conduct under the Sheriff Department's administrative guidelines. She cites those guidelines, which state that it will be a Class 3 offense to "[use] loud abusive or obscene language towards a staff member [or be] disrespectful toward *or harass*[] a staff member." Deputy Hartzog argues that when she testified that she did not feel "harassed" by exposure to inmates masturbating, she meant that because the incidents did not involve any verbal altercations, they were not "harassment" as defined in the guidelines.

The Court has examined the quoted portion of Deputy Hartzog's deposition transcript, and the precise meaning of her testimony on whether she felt "harassed" or "sexually harassed" by being exposed to masturbating inmates is not completely clear. But it is not necessary to decide what the meaning of Deputy Hartzog's statement was. Because it could have the meaning that she ascribes to it, the Court construes it as having such meaning for the purposes of this motion. At most, this creates an issue of disputed fact that must be resolved by the jury.

e.    Deputy Montano

Finally, the Sheriff's Department argues that Deputy Montano has not put forward evidence sufficient to establish pervasive and severe harassment. The Sheriff's Department specifically notes that at her deposition Deputy Montano could only identify two incidents that occurred in the relevant time period – an incident in 2015 in which an inmate licked his lips and made a sexually suggestive remark to a nurse accompanying Deputy Montano, and an incident where an inmate made sexually derogatory comments about females in general to another female deputy. The Sheriff's Department argues that these incidents are neither qualitatively nor quantitatively sufficient to support a Title VII hostile work environment claim.

Deputy Montano does not dispute that she only can provide evidence of two contemporaneous incidents of harassment, and that both of them consist of lewd or offensive remarks directed at other individuals (rather than inmate exposure or masturbation). Nor does she dispute that many of the incidents that she does testify about in her deposition involve events that occurred decades ago, or that she testified that she has been sexually harassed fewer than ten times in the 23 years that she has worked with the Sheriff's Department.

Instead, Deputy Montano tries to explain *why* she is unable to provide evidence of pervasive and severe sexually harassing conduct by inmates directed at her. She argues that this

is because she is assigned to the all-female Building 21 and works there almost exclusively, she only is responsible for supervising male inmates for five or ten percent of her time spent working at the Jail and/or the Center. She speculates that if she worked full-time in a male building or unit, she would experience the same pervasively hostile work environment to which the female deputies in those buildings or units are subjected.

As Deputy Montano notes, she has suffered no pervasive or serious sexual harassment, and the possibility that she might have had such an experience had she been assigned outside of Building 21 is entirely speculative. The question before the jury cannot be "if Deputy Montano worked in a different unit, would she have experienced pervasive and severe harassment?" Instead, the question must be "*did* Deputy Montano experience pervasive and severe harassment (in whatever building in which she worked)?" Her experiences, though distasteful, do not rise to the level of severe and pervasive.

        *4.     Actual or Constructive Knowledge of Harassment of the Deputies by Male Inmates.*

The Sheriff's Department argues that none of the identified Deputies has come forward with evidence to sufficient establish that liability should be imputed to it for conduct of male inmates. The Sheriff's Department specifically contends that the only evidence produced by the Deputies on this issue – the testimony of one or more of the Deputies (specifically including Deputy Casados) that they were told by a supervisor early in their tenure or even during training that tolerating sexual harassment was "part of the job," and the multiple OIC forms they submitted complaining of harassment by inmates – is not enough to give it actual knowledge of the purported harassment. The Sheriff's Department also notes that it took action in response to the OIC form complaints submitted by each of the Deputies who complained of sexually harassing conduct by inmates by moving the inmates in question, and that virtually all of the

challenged Deputies had ample opportunity during their annual performance reviews to complain of any harassment by inmates, but none of them did so.

As noted above, an employer can be held liable for the sexually harassing conduct of third parties where it had actual or constructive knowledge of that conduct but failed to take action to prevent or mitigate it. *Adler*, 144 F.3d at 673. The Deputies have come forward with evidence sufficient to establish of both actual notice and a constructive knowledge. With respect to the former, Deputy Casados provided deposition testimony that she was told by her supervisor when she first began working at the Sheriff's Department that exposure to public masturbation by inmates was just a part of the job that she would have to tolerate. This is sufficient to show that management-level employees at the Sheriff's Department were aware that female deputies would be exposed to exhibitionist masturbation at a minimum, and they did not intend to act to prevent or mitigate it. Deputy Casados also offers testimonial evidence that, at least historically, her complaints concerning inmate sexual harassment were not taken seriously by the Sheriff's Department, which also supports her actual knowledge argument.

Similarly on the issue of actual knowledge, Deputy DaShawn Walker has produced testimonial evidence that the Sheriff's Department actively discourages female deputies from formally complaining about harassing conduct on the part of male inmates, and when they do complain, no serious disciplinary sanctions are assessed on the offending inmates. In the same vein, Deputy Samone Walker has provided testimonial evidence that little or no action was taken by the Sheriff's Department when female deputies would complain of sexual harassment by inmates. The Supreme Court has held that an employer at least potentially can be held liable for failing to prevent the harassment of its employees where there is "[e]vidence that an employer did not monitor the workplace, *failed to respond to complaints*, failed to provide a system for

registing complaints, *or effectively discouraged complaints.*" *Vance v. Ball State Univ.*, 570 U.S. 421, 448-49 (U.S. 2013) (emphasis added). The Deputies' evidence that the Sheriff's Department discouraged female deputies from complaining about harassment from inmates, and that it was rare for offending inmates to face any meaningful punishment when the deputies did complain, places her claim squarely within that category.

The fact that only *some* of the Deputies have presented specific evidence that the Sheriff's Department had actual knowledge of the widespread and continuous sexually harassing conduct by male inmates is of no import as to the claims of Deputies who did not present such evidence. Whether the Department had actual notice/knowledge is viewed from the perspective of the information it had, not who provided it. Put another way, if the Sheriff's Department had actual notice that one or two *or 750 OIC complaints* that female deputies were experiencing pervasive sexual harassment by inmates – including lewd and degrading comments, indecent exposure, and exhibitionist masturbation – then it is reasonable to infer that that the Sheriff's Department has actual knowledge of an environment that did or could affect *all* female deputies charged with supervising male inmates. The Deputies have come forward with sufficient evidence that the sexually harassing conduct by inmates was sufficiently egregious and widespread to constitute actual and constructive knowledge of the Sheriff's Department for the purposes of summary judgment. Therefore, the Court finds that the Deputies have provided enough evidence to establish a *prima facie* case that the Sheriff's Department had constructive knowledge – as well as actual knowledge – of the sexually harassing conduct by inmates.

**B.      Disparate Treatment Claims**

The Sheriff's Department next argues that the Deputies have not come forward with evidence sufficient to make a *prima facie* case that they were subject to an adverse employment

action as a result of their sex. It broadly asserts that (i) being assigned to a particular post at the Jail or the Center (including Building 21) is not an adverse employment action, because it involves the same duties and responsibilities as many other posts, and (ii) sex-specific staffing policies in the corrections context are evaluated liberally and generally will be upheld where they further legitimate penological and privacy interests. The Deputies respond by contending that there is clear evidence that female deputies were assigned to less favorable posts – especially including posts in Building 21 – involving fundamentally different and more difficult job responsibilities.

### 1. *Disparate Treatment – the law*

As noted above, the Deputies' claim that they have been assigned to less favorable posts because of their sex is one for disparate treatment in violation of Title VII. Disparate treatment means "that an employer intentionally treated a complainant less favorably than employees with the complainant's qualifications but outside the complainant's protected class." *Young v. United Parcel Serv., Inc.*, — U.S. —, 135 S. Ct. 1338, 1345 (2015) (quotations omitted); *accord EEOC v. TriCore Reference Labs.*, 849 F.3d 929, 941 (10th Cir. 2017). "[A] plaintiff can prove disparate treatment either (1) by direct evidence that a workplace policy, practice, or decision relies expressly on a protected characteristic, or (2) by using the burden-shifting framework set forth in *McDonnell Douglas* [*Corp. v. Green*, 411 U.S. 792 (1973)]." *Young*, 135 S. Ct. at 1345.

Direct evidence is evidence that – if believed – proves the existence of a fact in issue without inference or presumption. *Punt v. Kelly Servs.*, 862 F.3d 1040, 1047-48 (10th Cir. 2017). It is normally very difficult or impossible to obtain, and it generally only will consist of a direct admission by an employer. *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1000 n.8 (10th Cir. 2011). If there is no direct evidence, a court considering a disparate treatment claim

must apply the *McDonnell Douglas* framework. "In that framework, 'the plaintiff must first establish a *prima facie* case of discrimination or retaliation. Then, the defendant may come forward with a legitimate, non-discriminatory... rationale for the adverse employment action. If the defendant does so, the plaintiff must show that the defendant's proffered rationale is pretextual.'" *Sotunde v. Safeway, Inc.*, --- Fed. App'x ----, 2017 WL 5643116, at *2 (10th Cir. 2017) (quoting *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011)). The Tenth Circuit has characterized this burden as "not onerous" and a "slight" one. *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005).

Here, the Deputies contend that they have come forward with both direct evidence and circumstantial evidence sufficient to meet their burden under the *McDonnell Douglas* framework. If they are correct on either of those arguments, then they will defeat summary judgment on their disparate treatment claim.

### 2. *Less Favorable Post Assignments as an Adverse Employment Action*

The parties agree that the Deputies have come forward with evidence showing that at least some of the supervisors in the Sheriff's Department staffed Building 21 at the Jail with all female deputies inasmuch as possible, but they disagree as to whether this staffing pattern constitutes actionable sexual harassment for the purposed of the Title VII disparate treatment analysis. The Sheriff's Department argues that it does not, because it did not cause a material change in the employment terms and conditions for such Deputies. The Deputies counter by asserting that because an assignment to a post in Building 21 involves significantly increased workload and stress, it can constitute an adverse employment action.

The Tenth Circuit liberally defines what constitutes an adverse employment action as conduct that significantly changes an employee's employment status, including as hiring, firing,

failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. *Piercy v. Maketa*, 480 F.3d 1192, 1203 (10th Cir. 2007); *Orr*, 417 F.3d at 1150. In contrast, conduct that has no more than a *de minimus* impact on the employee's future job opportunities is not an adverse employment action. *Hillig v. Rumsfeld*, 381 F.3d 1028, 1033 (10th Cir. 2004).

The inquiry as to whether a particular action constitutes an adverse employment action is context-dependent and must be evaluated on a case-by-case basis. *See Sanchez*, 164 F.3d at 531-32. For example, it is well-established in the Tenth Circuit (and elsewhere) that "an increased workload *might* constitute an adverse employment action in some circumstances." *Jones v. Barnhart*, 349 F.3d 1260, 1269-70 (10th Cir. 2003) (emphasis added); *accord Humbles v. Principi*, 141 Fed. App'x 709, 711-12 (10th Cir. 2005). The key focus of the adverse employment action analysis is whether the new assignment involves substantially different duties, compensation, or conditions of employment. *Piercy*, 480 F.3d at 1203-04.

Here, the Deputies have come forward with extensive evidence – most of it in the form of deposition testimony – that being assigned to a post in Building 21 involves a significantly higher workload and stress level than posts in other buildings and units, even including posts in male housing units. The evidence, taken as true at this juncture, is that Building 21 is understaffed, and jobs are less specialized. This means that responsibilities that are handled by separate units for male prisoners (*e.g.*, kitchen, intake, medical, laundry, GED preparation services, transition services) must be done by all of the deputies assigned to Building 21. This increases the quantity of work and the breadth of skills necessary to perform it. In addition, because Building 21 has no attached recreation yard (unlike most male housing units), deputies assigned to Building 21 must escort groups of inmates to and from the yard, and pat search them

upon return.  The open space housing and mixed groups of inmates that include varying degrees

of seriousness of charge, varying medical needs, and varying mental needs makes supervision

more challenging than with a more homogenous group of inmates housed in single or double

cells.  The Deputies further have come forward with evidence that all of these extra duties and

responsibilities make deputies assigned to Building 21 experience a much higher workload and

increased stress levels.  Finally, the Deputies have produced evidence from their expert witnesses

that based on a review of deputies' voluntary overtime requests, Building 21 appears to be a very

unfavorable assignment when deputies are given some choice in the matter (as they generally are

when putting in for overtime).  This evidence is sufficient to show that there are differences

between the work performed in Building 21 and elsewhere in the Jail or at the Center.

The question is whether  differences are so great as to change the nature of the job.   For

this, the parties turn to *Piercy v. Maketa*, 480 F.3d 1192 (10th Cir. 2007), a Tenth Circuit case in

which a female deputy challenged (1) the practice of the El Paso County jail of requiring female

deputies to staff an all-female unit in one of its facilities, which had the effect of preventing them

from bidding to work in other units in that facility, and (2) the ineligibility of female deputies to

transfer to a sister facility that housed a smaller population of all-male inmates with

(purportedly) easier working conditions.  In *Piercy*, the Tenth Circuit distinguished between

units and an all-male sister facility.  As to bids for work in male and female units, the Court

found that all of the units in the facility in question – all-male or all-female – involved "similar

duties and responsibilities," and thus, were not "substantially different than one another."  *Id.* at

1203.  The only duty peculiarly associated with working in an all-female unit (patting down

female inmates) was a "mere inconvenience" and thus a policy affecting limiting the plaintiff's

ability to bid for posts in an all-male unit did not rise to the level of an adverse employment

action. *Id.* at 1204 & n.13. However, with regard to transfers to the all-male sister facility, the evidence was that the job at the all-male facility was significantly less arduous than at the plaintiff's facility. Thus, a prohibition of female deputies transferring to such facility could be an actionable Title VII violation. *Id.* at 1204-05.

Following the reasoning of *Piercy*, the question is whether the differences between Building 21 and all male units at the Jail and Center represent differences best characterized as "mere inconveniences" or differences that are better characterized as "more or less arduous". But it is important to note that the facts in *Piercy* vary from those presented here.

In *Piercy*, (1) neither male nor female inmates were segregated by the severity of their offenses, and (2) that in female units, only female deputies were required to pat search female inmates. There was no distinction between male and female units as to the location of the recreational yard, the diversity of tasks that deputies were required to perform, cell configuration or mixture of inmates with mental health issues. As to the differences between facilities, the court points only to the fact that there were more deputies/inmate than in the facility where female deputies worked.

Certainly, the differences between the expectations of deputies on post in Building 21 and all male units in the Jail and Center are more substantial than that recognized for different units in *Piercy*. Arguably, they even exceed the differential between the two facilities in *Piercy*. Thus, the Court finds that for purposes of determination of this motion, the Deputies have come forward with sufficient evidence from which a jury could reasonably decide that Sheriff's Department of assigning only female deputies to Building 21 posts constitutes an adverse employment action. Accordingly, insofar as any of the individual Deputies can produce evidence that they were assigned to posts in Building 21 against their wishes, that will be enough

to establish a *prima facie* showing with respect to her Title VII disparate treatment claim, and that claim will proceed to trial.

### 3. *Direct Evidence/*McDonnell Douglas *Framework*

As explained above, to proceed on their summary judgment claim, the Deputies must come forward with evidence sufficient to constitute either "direct evidence" that some workplace policy, practice, or decision of the Sheriff's Department relied expressly on a protected characteristic in subjecting the Deputies to an adverse employment action, or circumstantial evidence sufficient to satisfy the *McDonnell Douglas* burden-shifting framework.

Regardless of what step the evidence is considered, it is sufficient. Deposition testimony from at least four supervisor-level employees or other representatives of the Sheriff's Department[5] acknowledge that prior to 2015 or 2016; it was the informal practice of the Sheriff's Department to attempt to staff Building 21 and the other female units and/or buildings with all-female deputies where possible. Two Deputies testified that they were specifically told by

Insofar as any of the Deputies can show that they were assigned to Building 21 or another all-female building or unit due to a Sheriff's Department policy requiring sex-based assignments, they have come forward with sufficient evidence – both under the direct evidence standard, as well as under the *McDonnell Douglas* framework – to meet their *prima facie* burden, and their Title VII disparate impact claims should proceed.

### 4. *Evidence of Sex-Based Assignments of the Deputies to Building 21 or another Unfavorable Post*

That leaves one more dispositive question for the Court – which of the Deputies have come forward with evidence that they were, in fact, assigned to Building 21 or a similar all-

---

[5] Those employees and other representatives include Elias Diggins (interim sheriff and 30(b)(6) witness), Jeremy Heinrichs (supervising sergeant), Kenneth Juranek (supervising sergeant), and Charles Denovellis (supervising sergeant).

female unit based on their sex?  Obviously, the generic observation that the female Deputies were required to work less favorable posts in Building 21 and similar all-female units is not enough to establish a *prima facie* case as to any specific Deputy.  Each of those individuals will need to point to some evidence that she was assigned to a Building 21 post despite her preference to work elsewhere.

In that regard, the Court has reviewed the record on summary judgment and has determined that the following Deputies have provided testimonial evidence (either deposition or affidavit/declaration, or both) that they were assigned to the purportedly more-difficult Building 21 against their wishes or preferences:  Deputy DaShawn Walker, Deputy Samone Walker, Deputy Hartzog, Deputy Denbow, Deputy Kemp, Deputy Maes, Deputy Montano, Deputy Esquibel, Deputy Eddy, and Deputy Purdy.  Furthermore, Deputy Wright offered testimony via a declaration that male deputies generally received much more favorable assignments to posts not involving continuous inmate supervision, whereas female deputies generally were assigned to less desirable posts requiring that supervision, though she did not specifically tie that scenario to Building 21 or any other all-female unit.

In light of the foregoing discussion of assignment to Building 21 as an adverse employment action generally, and the sufficiency of the Deputies' evidence generally to establish a *prima facie* case for the purposes of the *McDonnell Douglas* analysis, this is enough for the Court to conclude that each of those Deputies identified immediately above has put forward sufficient evidence to show that they were subject to disparate treatment to defeat summary judgment.  Therefore, their claims will proceed to trial.

In addition to the Deputies who claim that they were subjected to disparate treatment by being assigned to Building 21 or a similar all-female unit, a handful of Deputies assigned to posts outside of Building 21 contend that (i) they were improperly denied the opportunity to be assigned to favorable special assignment posts, or (ii) that they were assigned to other unfavorable posts, because of their sex.

1.     Deputy Rasmussen.

Deputy Rasmussen contends that she was treated less favorably than male deputies because she was not considered for special assignment to scout car detail, despite repeated attempts to request such an assignment.  Scout car detail involves transporting arrested individuals and prisoners to and from the Jail and the Center.  It apparently is a very popular post among deputies because it has limited inmate contact, and it allows the deputies assigned to the post to get "out and about."  Deputy Rasmussen offers testimonial evidence that on multiple occasions she was passed over in favor of male deputies for voluntary assignments to scout car detail, including on occasions when she was the first volunteer, and including instances in which the male deputy who was given the assignment was junior to her.  She provides further testimonial evidence that female deputies were not assigned to scout car detail as a rule, and that when she requested it, the supervisors "basically just laughed" at her.

The only contested issue is whether Deputy Rasmussen's evidence that she was not considered for the assignment constitutes an adverse employment action under *McDonnell Douglas*.  For its part, the Sheriff's Department argues that assignment to scout car detail merely was a "preferential assignment," which cannot constitute an adverse employment action.  The

Sheriff's Department cites a single case from another district court in the Tenth Circuit, *Ellison v. Sandia Nat'l Labs.*, 192 F. Supp. 2d 1240, 1257 (D.N.M. 2002), in support of this proposition.

As explained above, the focus in determining whether a particular assignment or reassignment is an adverse employment action is on whether the new assignment involves substantially different duties, compensation, or conditions of employment. *Piercy*, 480 F.3d at 1203-04. Here, Deputy Rasmussen has produced evidence that scout car detail involves tangibly favorable working conditions – the ability to work outside of the Jail and/or Center, limited inmate supervision, *etc.* – that are not present in other posts throughout the Sheriff's Department. A jury or other fact-finder might reasonable find that these significant differences are sufficient to constitute an adverse employment action for the purposes of her Title VII disparate treatment claim. Therefore, summary judgment is not warranted on that claim.

2.     Deputy Major.

Deputy Major claims that although she was nominally assigned to an intake post at the Center, she was disproportionately frequently removed from that post and assigned to a male housing unit, which subjected her to sex-based harassment by the inmates.[6] Deputy Major provides testimonial evidence that she believes that this unfavorable temporary reassignment was based on her sex, and she also presents testimony that the only other female deputy assigned to that intake post in the Center also was reassigned to the housing unit more often than male inmates were.

Unlike the Deputies challenging the prior (purported) policy to staff Building 21 with all-female deputies, or Deputy Rasmussen challenging the refusal to assign her to scout car detail, Deputy Major has not produced sufficient evidence to establish a *prima facie* case that the

_____

[6]     Deputy Major also alludes to the fact that she asked to be assigned to scout car detail on one occasion and was turned down, but there is no evidence that this was because of her sex.

differences between an intake post and a housing supervision post are significant enough to render the temporary reassignment to the latter an adverse employment action.  It may be true that intake requires less continuous supervision over the same group of inmates than a housing post, but there seems to be little dispute that it does, in fact, require significant inmate supervision.  Deputy Major has offered no evidence to suggest that the level of inmate supervision between the two posts is materially different.  Indeed, it appears from Deputy Major's deposition testimony that temporary assignments to the housing unit were a normal and expected part of the intake post – she just felt that at least certain shift supervisors were unfairly targeting female deputies for more frequent reassignments (*i.e.*, she merely was asked to do a normal part of the intake post assignment more frequently than she would have liked).

Therefore, the Court concludes that entry of summary judgment in favor of the Sheriff's Department is appropriate on Deputy Major"s disparate treatment claim.

3. <u>Deputies Eddy and Mickelson.</u>

Finally, Deputies Eddy and Mickelson have not provided the Court with any evidence that they suffered an adverse employment action – or even anything resembling an adverse employment action – on the basis of their sex.  Instead, the evidence provided by these Deputies solely appears to concern the sexual harassment they experienced from inmates and their Title VII hostile work environment claims (for which the Sheriff's Department not moved for summary judgment).  Therefore, summary judgment in favor of the Sheriff's Department  is warranted on their disparate-treatment claims.

**C.	Constructive Discharge Claims**

Lastly, the Court notes that parties spend a not-inconsiderable amount of space in their briefs arguing about whether five Deputies – Deputies Eddy, Major, Mickelson, Purdy and

Rasmussen – have come forward with sufficient evidence to establish a *prima facie* case for a constructive discharge claim. The problem with these arguments is that these Deputies do not bring a standalone constructive discharge claim. Rather, as pleaded in the operative Second Amended Complaint, the only relevance that a constructive discharge theory has in the case involves the discrete question of what harm the since-departed Deputies experienced as a result of (allegedly) being subjected to a hostile work environment by the Sheriff's Department – *i.e.*, what damages they have incurred in connection with their hostile work environment claims. And the Sheriff's Department has not moved for summary judgment on those claims with respect to Deputies Eddy, Major, Mickelson, Purdy and Rasmussen.

The hostile work environment claims of Deputies Eddy, Major, Mickelson, Purdy and Rasmussen are not before the Court for the purposes of summary judgment. The Court need not – and will not – address the question of whether that purported hostile work environment was sufficiently severe to force the Deputies to resign or retire when they otherwise would not have, thus incurring lost wages and other economic damages.

## ORDER

For the foregoing reasons, the Court orders as follows. The Motion for Partial Summary Judgment submitted by Defendant City and County of Denver, Denver Sheriff Department (**# 93**) is **GRANTED IN PART** and **DENIED AS MOOT IN PART**. Summary judgment is **GRANTED** in favor of the Defendant Sheriff's Department on the following: (1) the hostile work environment claim (Claim I) asserted by Plaintiff Sadie Montano; (2) the disparate treatment claim (Count II) asserted by Plaintiff Peggy Major; (3) the disparate treatment claim (Count II) asserted by Plaintiff Terri Eddi; and (4) the disparate treatment claim (Count II) asserted by Plaintiff Courtney Mickelson.

Summary judgment is **DENIED** with respect to all other claims against all other

Plaintiffs.  Those claims shall **PROCEED** to trial.

Within fourteen days of this Order the parties are directed to jointly contact chambers at

(303) 335-2289 to set this matter for a final pretrial conference.

Dated this 26th day of March, 2018.

BY THE COURT:

_____
Marcia S. Krieger
Chief United States District Judge

.