**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 15-cv-02539-MSK-MJW

TERRI EDDY,
REBECCA ESQUIBEL,
DENITA HARTZOG,
GIOVANNA KEMP,
LISA MAES,
PEGGY MAJOR,
COURTNEY MICKELSON,
SADIE MONTANO,
PAULA PURDY,
STACI WRIGHT,
SAMONE WALKER,
DASHAWN WALKER,
THERESA DENBOW,
CESQUA RASMUSSEN,
RHONDA CASADOS, and
CESQUA RASMUSSEN

Plaintiffs,

v.

CITY AND COUNTY OF DENVER, DENVER SHERIFF DEPARTMENT,

Defendant.

---

**[PROPOSED] PRETRIAL ORDER**

---

## 1.      DATE AND APPEARANCES

The Final Pretrial Conference was held in person on April 1, 2019. Brian T. Moore

and Niki V. Schwab of Jester, Gibson, & Moore, LLP and Wilbur Smith of Wilbur Smith

P.C.  appeared for the Plaintiffs. Jessica Allen, Shelby Felton, and Ashley Kelliher,

Assistant City Attorneys, City and County of Denver, appeared for the Defendant, the City

and County of Denver, Denver Sheriff Department ("Defendant" or "Department").

## 2.  JURISDICTION

Plaintiffs bring two claims under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.* They contend that the Sheriff's Department violated Title VII by (1) exposing them to a hostile work environment that included pervasive sexual harassment by inmates at two Denver jail facilities, while failing to take reasonable steps to mitigate or prevent the harassment; and (2) unlawfully assigning them to objectively and materially less favorable posts because they were women. The Court exercises federal question jurisdiction with regard to these claims pursuant to 28 U.S.C. § 1331.

## 3.  CLAIMS AND DEFENSES

**PLAINTIFFS**

Plaintiffs, all current or former deputy sheriffs with the Department, have asserted claims against the Department of hostile work environment and disparate treatment.

*Hostile Work Environment*

Plaintiffs Casados, Denbow, Eddy, Esquibel, Hartzog, Kemp, Maes, Major, Mickelson, Purdy, Rasmussen, D. Walker, S. Walker, and Wright, have alleged that for years, they were subject to sexual harassment by male inmates that was so pervasive and severe that it created a hostile work environment. This harassment took the form of abusive, and sometimes violent, sexually-charged verbal assaults, and exhibitionist masturbation by inmates. Male inmates habitually waited for a female deputy to complete her rounds and then openly masturbate in front of the female deputy in order to intimidate or traumatize her. Throughout each of their employments with the Sheriff's Department,

Plaintiffs were threatened with sexual violence including rape and sodomy, and routinely called gender-based slurs, such as "fucking bitch," "stupid ho," and "cunt."

Between 2012 and 2016, deputies in the Department filed at least 100 reports describing incidents in which male inmates engaged in exhibitionistic masturbation or other forms of indecent exposure directed at or in the presence of female staff. In the same time period, deputies in the Department filed over 600 reports describing incidents in which male inmates verbally harassed female staff in a sex-based manner, such as making sexual threats or making sex-based insults. Despite its knowledge of the ongoing sexual harassment by male inmates, the Department did little to correct or address the situation. The Department failed to take steps not only in disciplining those male inmates guilty of such harassment, but it also failed to train its deputies, sergeants, and command staff in managing and addressing sexual harassment. Recruits in the Department's Academy were never specifically instructed that inmates sexually harassing deputies was wrong, nor were deputies told to write up inmates for sexually harassing deputies. Instead, for years, it was an unwritten rule at the Department that female deputies must put up with sexual harassment and not report it. If they complained about it, they were viewed as weak and unable to handle the job, and told that male officers would not want to work with them. Those deputies who dared to speak up regarding the abuse were told "it's part of your job," "just do your job," and that you "get paid to deflect those types of comments."

When Deputies did file reports that initiated a formal disciplinary process, the Department's responses were highly inconsistent. Sometimes the Department would fail

to complete a hearing within 72 hours, as required by Department policy, and therefore dismiss the complaint. More commonly, it suspended most or all of the discipline imposed, with the effect that the inmate suffered little or no consequences. Even when sanctions were imposed, those sanctions were limited by Department policies that identified even repeat incidents of indecent exposure as "minor offenses," and failed to define any offenses specific to common types of inmate sexual harassment of deputies.

The Department not only failed to properly address sexual harassment, but often, command staff and sergeants at the Department discouraged female deputies from filing OIC reports, citing as excuses that inmates were "crazy" or that constructive work assignments should be administered. Constructive work assignments were particularly problematic for female deputies because not only were they forced to take the abuse from male inmates, but supervisory staff was aggravating the abuse by requiring these deputies to remove the inmates from their cells and monitor them while they completed their work assignments. Further, this discouragement has led to an underreporting of sexual harassment.

There are numerous steps the Department could have taken over the years to mitigate the frequency of inmate harassment of female deputies. These steps include providing deputies with training and the tools to address inmate harassment, directly referring all incidents of indecent exposure to law enforcement for possible criminal prosecution, and training command staff to take seriously all complaints of sexual harassment. There are readily available examples of policies the Department could have emulated in order to more effectively deter sexual harassment of staff by inmates in its

facilities, each of which are currently being used by corrections departments across the country.

The hostile work environment created primarily by male inmates was exacerbated both by the lack of support female deputies received from superior officers when confronted with such conduct and the segregation of female staff into less favorable posts, discussed below. Due to the severity of the sexual harassment, several Plaintiffs prematurely ended their careers with the Department. Plaintiffs Eddy, Major, Mickelson, Purdy, and Rasmussen have alleged that she was constructive discharged from the Department.

*Disparate treatment.*

Plaintiffs Eddy, Esquibel, Hartzog, Kemp, Maes, Montano, Purdy, D. Walker, S. Walker, Wright, Denbow, and Rasmussen have alleged that they were subject to disparate treatment by the Department. Plaintiffs' claim for disparate treatment arises primarily from the Department's segregation of female floor deputies into Building 21 and discrimination against female floor deputies in the assignment of posts that provide relief from continuous inmate supervision. Despite the Department's policy on cross-gender supervision, the Department's own witnesses admit that staffing decisions were made based on sex, in violation the Department's own policy.

Building 21 houses only female inmates, and differs from the Department's other housing units in that it functions as its own entity, meaning that most functions occur within the Building, as opposed to at a centralized location. It is more demanding in many respects, including that it has less segregation of inmates by security level, an outdated

layout dependent on indirect supervision of inmates, and is generally understaffed. The number of female inmates returning to the facility every day is greater than in male units, because the inmates on work-release are mixed in with the rest of the population, instead of being in a separate unit, and because Building 21, unlike the rest of the County Jail, houses pre-sentenced inmates. Because these inmates have to go to court, this further increases the comings and goings at the facility, placing additional demands on the deputies assigned to Building 21.

The Department's witnesses have admitted that prior to February 2016, the Department had a practice of staffing Building 21 with only female deputies, to the extent possible. However, for Building 21 to run efficiently, the Department need only assign two female deputies to those posts, and the rest of Building 21 could be staffed with male deputies with no harm to operations. Given the way Building 21 was staffed between 2013 and 2015, of the 21 posts per day, only 48% of the post assignments needed to be filled by female deputies, but approximately 94% of Building 21 post assignments went to female deputies.

The Department also has a practice of not assigning female deputies to Buildings 19, 24C or 24D, or the kitchen posts, and discriminated against female deputies with respect to assignment to certain other non-housing posts. The Department has a pattern of assigning male deputies to sought-after posts for gender-based reasons, including, but not limited to, believing that male deputies are better able to break up fights among inmates.

The Plaintiffs asserting this claim spent a highly disproportionate amount of time

working in Building 21. These Plaintiffs rarely received the benefit of working varied post assignments, which would have helped each of them manage their corrections fatigue. Even when certain Plaintiffs received the benefit of working more desirable posts, meaning those which involved less inmate supervision, they were often pulled from those posts to fill gaps in deputy assignments in Building 21. Female deputies were pulled from these desirable posts at a far higher rate than were male deputies, despite often having seniority over the male deputies. As a result of these practices, during 2013-2015, the average male deputy was assigned to posts that did not require continuous inmate supervision 45.3% of the time, whereas the average female deputy received such assignments only 27.5% of the time.

In addition to her claims of being disproportionately scheduled to work in Building 21, Plaintiff Montano was habitually denied several provisional assignments for which she applied between January and September 2015. These provisional assignments are intended to provide career enrichment opportunities for employees.

Each of these Plaintiffs would have preferred to work a greater variety of assignments, and especially to have more often received assignments that did not involve continuous inmate supervision. However, due to her gender, the Department not only consistently assigned each Plaintiff to Building 21, but also regularly took away the few opportunities for respite each had when she was assigned to a non-inmate supervision post.

*Relief Sought.*

a.  Economic damages, as calculated by Plaintiffs' expert report;

    b.  Non-economic damages up to the caps set by Title VII;

    c.  Attorneys' fees and cost; and

    d.  Equitable relief, including but not limited to:

        a.  Training of recruits, deputies, and command staff regarding sexual misconduct;

        b.  Adoption of formal policy that incidents involving indecent exposure in the presence of staff must be referred to the Denver Police Department;

        c.  Instructions to supervisors that they may not discriminate based on gender in post assignments;

        d.  Appointment of qualified independent monitor or special master, at Defendant's cost, to oversee compliance with equitable relief and to file periodic reports with the Court and Plaintiffs;

        e.  Front pay for appropriate Plaintiffs; and

        f.  An increase of damages to offset negative tax consequences.

**DEFENDANT**

*General defenses*

Plaintiffs do not have claims for hostile work environment or disparate treatment. Defendant's general defenses to both claims include: at all times, Defendant's actions were lawful and justified; the claims fail as they may be barred, in whole or in part, by the applicable statutes of limitations; Plaintiffs have suffered no damages in connection with their alleged claims; the causes of Plaintiffs' damages, if any, as alleged in the Second Amended Complaint, are wholly unrelated to any alleged acts or omissions of Defendant;

all actions taken by Defendant complied with all Constitutional and statutory obligations; Plaintiffs' claims are barred by Defendant's good faith efforts to comply with Title VII; and any and all actions that Defendant took concerning Plaintiffs were based on reasonable, legitimate, non-discriminatory factors, and were consistent with business necessity. Defendant disputes that Plaintiffs are entitled to any of the relief sought.

*Hostile Work Environment*

Plaintiffs' hostile work environment claim fails because each plaintiff cannot prove (1) she was subjected to harassment based on her gender; (2) that the harassment was severe and pervasive in both an objective and subjective sense; and (3) that the harassment altered a term, condition, or privilege of her employment and created an abusive working environment; (4) management level employees knew or should have known of the alleged harassment; and (5) that management level employees failed to implement prompt and appropriate corrective action.

Inmates at the Denver Detention Center and the Denver County Jail are incarcerated for a wide range of alleged offenses, including but not limited to domestic violence, drug use and possession, assault, murder, theft and more.  Both male and female inmates regularly use inappropriate language toward each other and toward both male and female deputies.  Both male and female inmates sometimes act inappropriately toward male and female deputies, including making threats and failing to follow specified jail rules.  Although a deputy's job is to ensure the care, custody and well-being of inmates, much of their time is spent addressing behavioral issues presented by inmates. A large percentage of the inmates, both male and female, have mental health issues, and

deputies have to deal with behavior problems that arise therefrom.

The Denver Sheriff Department maintains an inmate handbook, which includes a specific code of conduct for inmates that specifically prohibits sexual harassment, threats of violence, and verbal abuse by inmates toward deputies. When an inmate violates a jail rule, the inmate is subject to discipline in various forms, including but not limited to being locked down in their cell for the rest of the day, losing privileges, or being moved to "corrective custody," a cell in which the inmate is housed alone for 23 hours per day. The number of cells available for corrective custody are limited, and supervisors must decide which inmates who have been found guilty of various jail charges (ranging from smuggling drugs to violent events to sexual harassment) to those cells.

Both male and female deputies were subjected to sexually charged verbal assaults, threatened with sexual violence, and exhibitionist masturbation. Male inmates did not frequently time exhibitionistic masturbation to occur when they know a female deputy is about to be present. The slurs referenced by Plaintiffs were made by male and female inmates and were not made based on Plaintiffs' gender. For example, inmates called male and female deputies the word "cunt" and "bitch," and their doing so was often based on their being angry for not getting something they wanted or due to their mental health issues. In the few instances where Plaintiffs were called slurs by male or female inmates, they generally were not based on Plaintiffs' gender but instead based on anger or frustration during their encounter with Plaintiffs or based on mental health issues. Plaintiffs sometimes did not write up inmates (and therefore the inmates were not disciplined) because they believed the inmates' mental health issues precluded the

inmates from understanding their actions.

Each of the Plaintiffs filed very few incident reports regarding alleged sexual behaviors toward them by inmates (and some Plaintiffs filed no such reports) and in each incident where such conduct was reported, it was not based on the Plaintiffs' gender and was appropriately addressed by the Department.

Between 2012 and 2016, there were not 100 reports of exhibitionistic masturbation or other forms of indent exposure by male inmates directed at or in the presence of Plaintiffs, nor were Plaintiffs aware of most, if not all, of the reports of exhibitionist masturbation. Nor were there over 600 reports describing incidents of male inmates harassing Plaintiffs, or other female staff in incidents witnessed by Plaintiffs, a sex-based manner. The 600 reports referenced by Plaintiffs show a wide variety of situations in which male inmates used inappropriate language, but those incidents were not based on gender, rarely involved the Plaintiffs, and involved many inmates who suffered mental health issues who Plaintiffs concede should not be held responsible for their behavior. When Plaintiffs and other deputies put Defendant on notice of sexual harassment by male inmates by writing a report and charging the inmate with a jail violation, or by advising a member of command staff of the situation that took place, Defendant addressed the situation.  In order for an inmate to be disciplined, the deputy experiencing or witnessing the misconduct must write up a report and charge the inmate with violations of the jail handbook. Deputies, sergeants, command staff, and recruits were trained to manage and address inmate misconduct, including conduct which Plaintiffs refer to as sexual harassment, through writing reports. All deputies were encouraged to write reports, and

female deputies were especially encouraged to write reports if and when they felt they had been sexually harassed. They were trained in the academy to do so.

It was never an unwritten rule that female deputies must tolerate sexual harassment and not report it. Female deputies who did report sexual harassment were never viewed as weak or unable to handle the job, nor were they told that male deputies would not want to work with them. While dealing with and deflecting misconduct by inmates is part of the duties of all deputies, female deputies were never expected to put up with such misconduct and could impose disciplinary charges anytime such conduct occurred.

When deputies initiated the formal disciplinary process, Defendant responded by initiating an investigation process which involved interviewing the inmate and any witnesses. Then a Captain would engage in a "Conduct Adjustment Board," or "CAB," process, giving the inmate due process through a hearing process, The Captain then made a decision as to what discipline (if any) would be imposed against the offending inmate, taking all factors into consideration, including the facts of the incident, the discipline history of the inmate, the inmate's classification, and available corrections space (corrections space include cells sometimes referred to as "the hole" in which inmates spend 23 hours inside the cell alone) Between 2012 and 2016, there were over 16,000 OIC reports filed that had to be reviewed and considered for discipline. There were occasions that disciplinary consequences would be suspended for a period of time as an incentive for the inmate to change his or her behavior without having to take up valuable and scarce corrections space. For example, an inmate might receive a

disciplinary sentence of 60 days of corrections time, but the sentence could be suspended for 60 days, meaning that if the inmate got into trouble again within those 60 days, the inmate would have to serve the prior discipline as well as discipline for new charges. Defendant found this to be an effective deterrent to misconduct. Defendant's policies set forth disciplinary conduct categories and a range of sanctions to be imposed for each category.   These policies were based on industry standards and approved by the American Correctional Association and the Commission on Accreditation for Law Enforcement Agencies.

Defendant did not fail to properly address inmate conduct which Plaintiffs characterize as sexual harassment.  Indeed, during the few times (if any) that each of the Plaintiffs reported sexual harassment, the offending inmate was disciplined. Command staff and sergeants did not discourage Plaintiffs or any other female deputies from filing reports against inmates.   However, there were times that inmate conduct could be effectively addressed with constructive work assignments such as scrubbing toilets, stairs and floors, or cleaning up feces and urine left by other inmates with behavioral or mental health issues. Constructive work assignments did not force female deputies to take additional alleged abuse from inmate; no female deputies, including none of the Plaintiffs, have ever reported such.  Deputies never put Defendant on notice that constructive work assignments were an ineffective method of discipline nor that it led to underreporting of inmate misconduct.   Instead, deputies and sergeants reported that constructive work assignments were effective deterrents to future misconduct.

Defendant took numerous steps over the years to mitigate the frequency of inmate

misconduct directed at all deputies, including female deputies, including but not limited to improving processes for CAB hearings, and providing training and tools to address inmate harassment.   Deputies were encouraged to refer all incidents of exposure to law enforcement for possible criminal prosecution, and appropriate incidents involving Plaintiffs were, in fact, referred to the Denver Police Department.   Command staff were expected to take all complaints of sexual harassment by inmates seriously. Defendant's policies and procedures regarding inmate conduct and sexual harassment were in accordance with industry standards and approved by the American Correctional Association and the Commission on Accreditation for Law Enforcement Agencies.

Plaintiffs did not report a hostile work environment created by male inmates prior to filing their EEOC charges, nor did they report a lack of support received from superior officers.

Defendant disputes that Plaintiffs Eddy, Major, Mickelson, Purdy, or Rasmussen prematurely ended their careers as a result of inmate conduct which they describe as sexual harassment.   Each of these Plaintiffs had other reasons for wanting to leave the Denver Sheriff Department, including but not limited to the desire to work as law enforcement officers in other jurisdictions where they would have different responsibilities, and to retire after a long career.   At the time they left the Department, none of these Plaintiffs stated that their leaving had anything to do with alleged sexual harassment by inmates.

Defendant's affirmative defenses include that Defendant exercised reasonable care to prevent and correct promptly any sexually harassing behavior; Defendant had

policies against sexual harassment in the workplace which were communicated to employees and inmates; Plaintiffs were aware of and trained on these policies; Defendant's policies and practices provided reasonable avenues for Plaintiffs to complain to anyone in the chain of command, human resources, the EEO Coordinator, or the Office of the Independent Monitor; when harassment was reported, Defendant took prompt and reasonable corrective action by disciplining the inmates and if charges were brought by Plaintiffs there were consequences through the Conduct Adjustment Board; Plaintiffs failed to take advantage of any preventive or corrective opportunities; Plaintiffs failed to assign constructive work assignments, lock down inmates, or request non-routine transfers for inmates that violated policies or conduct rules; Plaintiffs failed to complete offense in custody reports and assign charges against inmates responsible for harassment; Plaintiffs failed to complain timely about harassment; and Plaintiffs failed to mitigate their damages.

*Disparate treatment.*

Plaintiffs' disparate treatment claim fails because Plaintiffs did not suffer an adverse employment action and their gender was not a motivating factor for Defendant's conduct.

The Prison Rape Elimination Act ("PREA") states, as a matter of law, that there are certain duties within a jail that cannot be performed by male deputies including the pat-down and strip searches of female inmates. Defendant's policy on cross-gender supervision, which complies with PREA and has been approved by the American Correctional Association and the Commission on Accreditation Law Enforcement

Agencies, sets forth specific duties (such as strip-searching) that may not be performed by deputies of the opposite sex.  Defendant's post assignments in Building 21 and in other locations are made in accordance with its policies (including PREA) and operational requirements which are in accordance with the law and have been approved by the American Correctional Association and the Commission on Accreditation for Law Enforcement Agencies.  Defendant is regularly audited by these two regulatory groups, which includes interviews with deputies and command staff, and has been found in compliance with all national standards as a part of each audit.

 While Building 21 does house only female inmates, it does not differ from the functions in the other housing units.  Building 21 is not any more demanding than other housing units and, in fact, many deputies find working there less demanding because there are multiple deputies assigned to the building for each shift which allows them to take breaks more often and get assistance with certain tasks.  For example, while one deputy working with male inmates may have to supervise only 60 inmates at once while female deputies working in Building 21 may have to supervise 150 inmates, there may be three deputies or more assigned to supervise those 150 inmates.

Moreover, female inmates are classified and segregated by security level in Building 21 just as male inmates are in other housing units. Thus, female inmates are not more difficult to supervise as a result of classification levels.

Between 2012 and 2015, because of the limited number of post assignments available in Building 21 and the fact that there were duties that could only be performed by female deputies, there were times that Building 21 was only staffed by female deputies

in order for the Building to run efficiently. For example, only female deputies could pat search or strip search female inmates, which had to take place every time a female inmate left and returned to her pod.  If absolutely necessary, Building 21 could operate with only two female deputies. However, if the building is only staffed with two female deputies, the building runs far less efficiently and female deputies are unable to take breaks, as they cannot be relieved by male deputies if it results in a male deputy being the only deputy on the floor at a given time.  Female deputies assigned to Building 21 prefer to have fewer male deputies assigned to the Building so there is a better division of duties and so that they can take breaks.

Plaintiffs' reliance on percentages related to the assignments in Building 21 is improper as the disparate treatment claims in this case are not based on general staffing (and this is not a class action case), but is based on the individual assignments of each Plaintiff and only for the time period of 300 days prior to the individual dates on which they each filed their EEOC charge.  Moreover, the assignment percentages are being offered by Plaintiffs' experts based on flawed data. Defendant is challenging those opinions in a Rule 702 motion.

Any failure to assign female deputies to Buildings 19, 24, or the kitchen posts was based on business necessity and PREA, as the posts in those buildings required male inmates to be strip searched, and female deputies are not permitted to strip search male inmates.  Nor did Defendant did not have a pattern or practice of assigning male deputies to sought-after posts, and because this is not a pattern or practice case (e.g. not a class action), Plaintiffs should not be allowed to introduce any such evidence.

Plaintiffs asserting this claim did not spend a highly disproportionate amount of time working in Building 21. Plaintiffs did receive the benefit of working varied post assignments, including those that involved less inmate supervision, and were not frequently pulled from those posts to fill gaps in Building 21. If female deputies were pulled from other posts to fill gaps in Building 21, it was for legitimate business reasons. Plaintiffs' assertion that male deputies were assigned to posts that did not require continuous inmate supervision at a greater percentage than female deputies is based on flawed data and inadmissible expert opinions. Moreover, none of the Plaintiffs complained to their supervisors about working in Building 21 or asked their supervisors to assign them to another building. Plaintiffs could have applied to become supervisors or to work in special assignments that would result in them working in other Buildings or posts, but did not do so.

Plaintiff Montano was not disproportionately scheduled to work Building 21 nor was she habitually denied provisional assignments. Provisional assignments are not generally intended to provide promotional opportunities for employees. Plaintiff Montano applied for only a few provisional assignments, and she was not chosen for those because she was not the best candidate.

While Plaintiffs may have preferred to work positions that did not involve continuous inmate supervision, the primary job duty of a deputy is the care and custody of inmates which requires continuous inmate supervision. Defendant did not disproportionately assign each Plaintiff to Building 21, but made such assignments based on operational requirements. Defendant also did not disproportionately take away

opportunities for Plaintiffs to work non-inmate supervision posts.   The admission of Plaintiffs' asserted percentages regarding assignments to continuous inmate supervisions posts is improper as the data is flawed and is being offered by Plaintiffs' experts who will be the subject of Defendant's Rule 702 motion.   Moreover, the data regarding all assignments is improper as this is not a pattern-and-practice, or class action, case.   Only data related to Plaintiffs is potentially admissible, and such data was not considered by Plaintiffs' experts.

Defendant's affirmative defenses to this claim include that Defendant would have made the same decisions regarding post assignments regardless of Plaintiffs' sex and Plaintiffs failed to mitigate their damages.

## 4.  STIPULATIONS

Stipulated Facts:

1.      Plaintiffs were or are employed by Defendant City and County of Denver (the "City" or "Denver"), as deputies with the Denver Sheriff's Department.

2.      The City, through its Denver Sheriff's Department (the "DSD") is responsible for the care, custody, and transport of inmates for the City.

3.      Plaintiff Terri Eddy was employed by DSD between August 14, 1989 and May 31, 2016.

4.      Plaintiff Paula Purdy was employed by the DSD between March 14, 1994 and December 31, 2015.

5.      Plaintiff Cesqua Rasmussen was employed by DSD between October 28, 2013 and October 22, 2015.

6.      Plaintiff Courtney Mickelson was employed by the DSD between August 28, 2006 and January 27, 2015.

7.      Plaintiff Peggy Major was employed by the DSD between May 29, 1990 and July 1, 2015.

8.      The DSD consists of the following ranks, from highest-ranking to line officer:

   a.  Sheriff

   b.  Division Chiefs

   c.  Majors

   d.  Captains

   e.  Sergeants

   f.  Deputies

9.      Individuals who wish to become deputy sheriffs must first complete the Denver Sheriff's Academy.

10.     The DSD operates two separate jails: the Denver County Jail (sometimes referred to as the "County Jail" or "COJL") and the Van Cise-Simonet Detention Center or Downtown Detention Center, commonly referred to as the "DDC".

11.     The County Jail houses the majority of the female inmate population.  Most female inmates there are housed in Building 21.

12.     Job assignments within the Sheriff's Department are often referred to as "posts." The job requirements in some posts include strip-searching or pat-searching inmates.

13.     The Prison Rape Elimination Act ("PREA") governs correctional facilities. PREA includes standards regarding which gender deputy can conduct searches of which gender inmates. According to PREA, male officers generally may not conduct "frisk" or "pat" searches of female inmates, except under exigent circumstances

14.     The DSD has implemented Department Order 2025.1G, entitled "Assignment of Staff: Cross Gender Supervision" (the "Cross-Gender Supervision Policy").

15.     The Cross-Gender Supervision Policy explains that "[i]t is the policy of the [DSD] that there will be no discrimination in the assignment of posts or duties because of sex, race, color, creed, national origin, age, sexual orientation, political opinion or political affiliation.  The only exception is where the privacy of a prisoner mandates supervision by officers of the same sex."  This exception generally means that only male deputies can strip-search male inmates and only female deputies can strip-search female inmates.

16.     Building 21 at the County Jail houses only female inmates.

17.     A handful of female inmates may also be housed in Building 4 at the County Jail, which serves as a medical unit.  Further, approximately 75 to 80 female inmates are housed at the DDC in Units 2-A and 2-B, which are intake housing and restrictive or "special management" housing units.

18.     Inmates are "classified" based on a review of past criminal history, incarceration history, medical history, trauma history, mental health history, and other factors.

19.     Both male and female inmates are classified as part of the intake process.

20.     The female inmates in Building 21 are generally housed in eight open pods which can each hold up to 64 female inmates.

21.     The DSD maintains and provides inmates an Inmate Handbook that sets forth, among other things, the inmates' rights and privileges, expectations, rules, and consequences for violating the rules.

22.     The Inmate Handbook divides the violations that can be committed by inmates into four "classes" of offense. Class 1 offenses are the most serious and carry the greatest maximum sanctions, and Class 4 are the least serious and carry the smallest maximum sanctions.

23.     The DSD has a computerized system for reporting incidents and various types of inmate conduct.   That system is called "TAG."  The types of reports in the TAG system include, but are not limited to, Offense in Custody, For Information Only, Use of Force, Lockdown, Non-Routine Transfer, Medical, and Unauthorized Activity.

24.     If a report is filed in the TAG system charging an inmate with a violation of one of the offenses identified in the Inmate Handbook, it triggers an investigative and disciplinary process referred to as a "CAB". If the inmate at issue is found guilty of the alleged misconduct, the officer who presided over the CAB is responsible for imposing discipline against that inmate.  The types of available discipline identified in the Inmate Handbook are loss of privileges, corrective confinement and loss of good time credit. The Inmate Handbook states that all or part of the punishment may be suspended for a period up to 60 days.  Information regarding the hearing and punishment is included in the TAG system.

25.     Instead of filing charges against an inmate who commits a Class 4 offense, a deputy may give the inmate a "constructive work assignment."

26.     The types of charges that can be brought against an inmate under the Inmate Handbook are administrative charges. If an inmate's conduct constitutes a criminal offense, DSD may request that DPD file criminal charges against the inmate.

27.     In addition to inmate supervision, which is the primary responsibility of deputy sheriffs, there are other "special" or "provisional" assignments that may involve no or significantly less inmate supervision, and may require specific skills and specialized knowledge.

## 5.  PENDING MOTIONS

Pending before the Court is Defendant's Motion for Legal Ruling Regarding Applicability of Continuing Violation Doctrine to Plaintiffs' Disparate Treatment Claims and Request for Forthright Ruling [ECF No. 141], which is fully briefed.  On March 21, 2019, Magistrate Varholak issued a recommendation that Defendant's Motion be granted and that the Court hold that the continuing violation doctrine does not apply to Plaintiffs' disparate treatment claims.  ECF No. 168.

Rule 702 motions are due on March 29, 2019.

## 6.  WITNESSES

The parties' joint witness list is attached as Exhibit A.

## 7.  EXHIBITS

The parties' joint exhibit list is attached as Exhibit B.

## 8.  DISCOVERY

Discovery has been completed.

## 9.  SPECIAL ISSUES

Plaintiffs intend to file certain motions in limine and will confer with Defendant and file such motions at the appropriate time.

 Defendant intends on filing motions in limine or trial briefs asking the Court to limit the evidence as follows:

a. Limiting the time periods for which the Plaintiffs may submit evidence at trial. Defendant believes that the relevant time-period starts in 2012, at the very earliest, as this is the period for which the parties agreed to conduct discovery and produced documents.

b.  Limiting the evidence presented by Plaintiffs regarding their disparate treatment claims because the continuing violation doctrine does not apply;

c. Excluding testimony from Plaintiff Peggy Major that her PTSD allegedly has been exasperated by the alleged harassment as Defendant was not permitted to question her regarding her PTSD during her deposition and Plaintiff objected to any written discovery regarding her medical records;

d. Exclusion of any evidence of sexual harassment toward non-plaintiff employees where it is not first shown that a Plaintiff was aware of such behavior; and

Other issues of law which may remain after the Court rules on other pending

motions or motions to be filed, as well as any other issues that may arise between the filing of this Proposed Pretrial Order and trial. The Court's ruling on these anticipated motions may affect the length of trial, as both parties could have witnesses and documents that would become inadmissible, depending on the Court's rulings.

## 10.  SETTLEMENT

a.      Plaintiffs made a settlement offer to the City in June 2017. The City has not responded to that offer, the parties have not engaged in any settlement discussions since that date, and it does not appear the parties will reach a resolution of this matter short of trial.

b.      Not applicable.

c.      The City was promptly informed of the written offer of settlement made by the Deputies in June 2017.

d.      Counsel for the parties and any *pro se* party do not have any settlement conferences scheduled.

e.      It appears from the discussion by all counsel and any *pro se* party that there is: little possibility of settlement.

f.      Counsel for the parties and any *pro se* party considered ADR in accordance with D.C.COLO.LCivR.16.6.

## 11.  OFFER OF JUDGMENT

Counsel and any *pro se* party acknowledge familiarity with the provision of Rule 68 (Offer of Judgment) of the Federal Rules of Civil Procedure.  Counsel have discussed it with the clients against whom claims are made in this case.

## 12.  EFFECT OF FINAL PRETRIAL ORDER

Hereafter, this Final Pretrial Order will control the subsequent course of this action and the trial, and may not be amended except by consent of the parties and approval by the court or by order of the court to prevent manifest injustice.  The pleadings will be deemed merged herein.  This Final Pretrial Order supersedes the Scheduling Order.  In the event of ambiguity in any provision of this Final Pretrial Order, reference may be made to the record of the pretrial conference to the extent reported by stenographic notes and to the pleadings.

## 13.  TRIAL AND ESTIMATED TRIAL TIME; FURTHER TRIAL PREPARATION PROCEEDINGS

1.      Trial is to a jury, but to the court with respect to the Deputies' request for injunctive relief and the request of some Deputies for front pay damages.

2.      The Deputies believe trial can be completed in four weeks. The City believes that due to the fact that there are 15 Plaintiffs, numerous fact witnesses and hundreds of exhibits, the trial will necessitate six weeks, exclusive of jury deliberations.

3.      Trial will take place in Denver, Colorado.

4.      Any other orders pertinent to the trial proceedings: none.

DATED this _____day of _____ 2019.

BY THE COURT

_____
Christine Arguello
United States District Judge